Brian J. **PETERSON**, Plaintiff,

v.

**EXIDE CORPORATION,** Defendant.

Civil Action No. 99–1290–CM.

United States District Court, D. Kansas.

Nov. 22, 2000.

Larry G. Michel, Lance H. Cochran, Kennedy, Berkley, Yarnevich & Williamson, Chtd., Salina, KS, for plaintiff.

James C. Holland, Spencer, Fane, Britt & Browne, Kansas City, MO, for defendant.

1. The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Brian Peterson filed the instant lawsuit alleging that defendant Exide Corporation terminated his employment in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C, § 2601 et seq., and in breach of an alleged implied contract. This matter is before the court on defendant's motion for summary judgment (Doc. 30) and plaintiff's motion for partial summary judgment (Doc. 33).

● **Facts**[1]

Plaintiff began his employment with defendant on August 14, 1995. On August 7, 1995, plaintiff completed and signed an employment application, which stated, "I understand that my application is not a contract and cannot create a contract.... I acknowledge that my employment and compensation can be terminated with or without cause and with or without notice, at any time, at my option or the Company's." Plaintiff understood at the time he began his employment that he could be terminated with or without cause and with or without notice at any time. Plaintiff did not have any written contract of employment with defendant.

During plaintiff's employment, defendant provided him with Exide's Personnel Handbook. The introductory portion of the handbook stated, "The language used in this handbook is not intended to create, nor is it to be construed to constitute, a contract between the Company and any or all of its employees." Plaintiff was aware when he started working for defendant that the handbook was not a contract. Indeed, on August 8, 1995, when he first started his employment, and again on September 11, 1997, during the course of his employment, plaintiff signed a Receipt for Employee Handbook. By signing, plaintiff agreed that "the Employee Handbook is not a contract of employment and does not

in any way affect my status as an employee at will." Plaintiff read and was aware of the terms stated in the receipts.

Defendant's personnel handbook contained an attendance policy, which plaintiff knew of and understood. The attendance policy is based upon an employee's accumulation of absence occurrences, which may or may not mean one day of absence. For example, an employee may have an illness that requires three day's absence. In that case, the employee's absence would be considered only one occurrence. Under the attendance policy, absences pursuant to "Certified Family Medical Leave" are not considered an absence occurrence. Excessive absenteeism is defined in the personnel handbook as "any combination of three (3) absence occurrences, arriving late or leaving early that occur in any ninety (90) day period, [and] will result in a written warning." Pursuant to the terms in the handbook, even absences for which an employee has a doctor's note may count as an absence occurrence.

Defendant's disciplinary procedures, of which plaintiff knew and understood, were also contained in the personnel handbook. Under the disciplinary procedures, employees receive a first written warning, then a second written warning, then an indefinite suspension, and finally termination. A second indefinite suspension within a six-month period equals termination. Further, the disciplinary procedures policy specifically states, "Nothing in this policy shall be deemed to limit the right of the company to terminate an employee at any time for any reason." Violations of the attendance policy are listed as violations requiring discipline up to and including termination.

In 1995 and 1998, an outside consulting company conducted an employee opinion survey. Both surveys were identical, consisted of a single page, and asked employees to indicate their opinions or feelings about certain aspects of their employment. No representative of defendant's company took part in conducting the surveys, which were anonymous and confidential. One question asked of employees was, "As long as I perform my job in a satisfactory manner, the job security I feel is [blank]." In 1995, 89% of defendant's employees indicated an answer of satisfactory, good, or very good to this question. In 1998, 83% of defendant's employees answered the same.

## I. Plaintiff's Termination

Plaintiff does not controvert that he received appropriate warnings and was initially suspended on July 31, 1998 for excessive absenteeism. By February 12, 1999, plaintiff accumulated three absence occurrences within a ninety-day period, which constituted excessive absenteeism in violation of the attendance policy. However, because this occurred more than six months after his first suspension, plaintiff received a repeat suspension, not termination. Plaintiff admits that both of these disciplinary suspensions were proper.

On May 6, 1999, plaintiff began work at 6:00 a.m., which was his normal start time, but left early for a doctor's appointment. Plaintiff arrived at the office of Dr. John Shetlar around 2:30 p.m. Dr. Shetlar was unaware that plaintiff had been working the entire day before his doctor visit. Dr. Shetlar diagnosed plaintiff with acute bronchitis and prescribed antibiotics. Dr. Shetlar also provided plaintiff with a note, which stated: "Brian was seen in the office today for an illness. Please excuse him from work on 5/7/99." Later that day, plaintiff provided the note to his supervisor and informed his supervisor that he would be absent the next day. Plaintiff's supervisor informed him that the absence would still count as an absence occurrence. Plaintiff did not go to work on May 7, 1999.

On May 8, 1999, plaintiff was scheduled to work and in fact worked his normal duties for the entire day. Plaintiff was not scheduled to work on May 9, 1999. On May 10, 1999, plaintiff was not scheduled to work but volunteered to work the entire day as overtime. He worked a full twelve

hours performing his normal duties. The following two days, plaintiff was not scheduled to work and in fact did not work.

Then, on May 13, 1999, plaintiff was scheduled to work and arrived at his normal starting time intending to work the entire day. Plaintiff's supervisor informed him that day that he had incurred his second suspension within six months because of excessive absenteeism. Plaintiff had been absent on February 16, 1999 (one occurrence), was more that ten minutes late without calling in on April 17, 1999 (one occurrence), and left early on May 6, 1999 with continuing absence on May 7, 1999 (one occurrence). Thus, within six months of his February 1999 suspension, plaintiff had accumulated three absence occurrences within ninety days, which constituted excessive absenteeism in violation of the attendance policy. As a result of his second suspension within six months, plaintiff's employment was terminated.

Plaintiff left the plant and returned that day about 8:00 a.m., requesting to speak to Todd Peterson, defendant's human resources manager. Plaintiff informed Mr. Peterson that he believed his absences on May 6 and May 7 were covered by the FMLA. Mr. Peterson told plaintiff that, based on the information he had, plaintiff's absences did not qualify under FMLA. Indeed, plaintiff admits that Dr. Shetlar's note dated May 6, 1999 was not sufficient for FMLA purposes. Mr. Peterson informed plaintiff that he should obtain additional information from Dr. Shetlar.

Around 9:30 a.m., plaintiff went to Dr. Shetlar's office but did not speak to Dr. Shetlar personally. Plaintiff obtained a new note, which stated: "Brian was in the office on 5/6/99 for sore throat, runny nose, cough. He reported his problems began on 5–5–99. He was treated with antibiotics. He was given a note excusing him from work for 5/7/99." After reviewing the note with his wife, plaintiff determined that this new note was insufficient to excuse his absences on May 6 and May 7. Plaintiff never provided this note to defendant but rather returned to Dr. Shetlar's

office for another note. Before plaintiff arrived, plaintiff's wife called Dr. Shetlar's office and stated that plaintiff was asthmatic and could not work on May 6 and May 7 because he was having trouble breathing.

Around 11:30 a.m., plaintiff returned to Dr. Shetlar's office but again did not speak to Dr. Shetlar personally. Plaintiff obtained another note, which stated: "Brain also has a history of asthma. The subject of asthma never came up in his visit to the office on 5/6/99, but he did have some wheezing of his lungs, so it is likely that his asthma was a factor in his recent illness." Dr. Shetlar mentioned asthma in this note based solely on the phone call from plaintiff's wife. Dr. Shetlar never diagnosed plaintiff with asthma. In fact, plaintiff admits that his absences on May 6 and May 7 were not in any way related to asthma or any other chronic health condition.

Plaintiff returned to Mr. Peterson that day with the latest note, which Mr. Peterson reviewed. Mr. Peterson informed plaintiff that the new note did not alter his determination that plaintiff's absences on May 6 and May 7 were not covered by FMLA. Plaintiff disagreed, so Mr. Peterson provided plaintiff with a blank FMLA certification form. Plaintiff then took the FMLA form to Dr. Shetlar's office around 3:00 p.m. that day, but he did not see Dr. Shetlar personally. Dr. Shetlar completed the FMLA form, indicating that plaintiff's serious medical condition began on May 5, 1999 and would last until May 16, 1999 and that plaintiff would be unable to perform his job functions until that time. However, Dr. Shetlar testified that, at the time he completed the FMLA certification, he was not aware that plaintiff had in fact returned to work on May 8 and May 10 and had reported to work on May 13 intending to work. Rather, Dr. Shetlar was under the impression that plaintiff had been off work since his office visit on May 6. According to Dr. Shetlar's deposition testimony, because plaintiff actually

worked on days between May 5 through May 16, Dr. Shetlar's opinion on the FMLA form concerning the duration of plaintiff's incapacity was incorrect. Dr. Shetlar further testified that, based upon his actual observation and treatment of plaintiff, the only absences from work that were medically necessary were May 6 and May 7, 1999.

Plaintiff returned the completed FMLA form to Mr. Peterson. On May 14, 1999, plaintiff spoke to Mr. Peterson by phone about the matter. Mr. Peterson informed plaintiff that his determination remained unchanged and that the absences did not qualify under FMLA because the after-the-fact certification contradicted Dr. Shetlar's earlier note and because plaintiff had, in fact, worked those days that Dr. Shetlar indicated plaintiff would be unable to do so. Soon thereafter, plaintiff was informed by the plant manager that plaintiff's termination would stand.

Plaintiff does not controvert that defendant complied with the proper steps in its disciplinary policy when it terminated plaintiff's employment. Plaintiff complains only that he should not have received his second suspension in May 1999 based on his May 6 and May 7 absences because he believes that those absences were covered by the FMLA.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact"and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; see *Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. FMLA

■ The FMLA requires that eligible employees be given twelve weeks of leave

during any twelve month period because of a "serious heath condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also provides for certification requirements to enable an employer to verify the existence of a serious health condition. Id. § 2613. Employers are specifically prohibited from interfering with an employee's rights under the FMLA or discriminating against an employee who has exercised such rights. Id. § 2615(a).

In accordance with the FMLA, the Department of Labor has issued regulations that define and govern the rights and responsibilities of respective parties. At issue in this case, is 29 C.F.R. § 825.114(a)(2)(i), which defines "serious health condition" entitling an employee to FMLA leave as "[a] period of incapacity (i.e., inability to work . . . ) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition." Indeed, the legislative history makes clear that Congress intended the FMLA to cover serious illnesses that last more than a few days. S.Rep. No. 3, 103d Cong., 1st Sess.1993, 1993 U.S.C.C.A.N. 3, at pp. 30–31. Thus, plaintiff's absences are not protected by the FMLA unless there is evidence from which a reasonable jury could find that plaintiff was incapacitated for more than three consecutive days.

Plaintiff's absences on May 6 and May 7 cannot qualify under the regulatory definition of "serious health condition" because, even assuming plaintiff was incapacitated on those days, the incapacity did not last more than three days. See *Bauer v. Dayton–Walther Corp.*, 910 F.Supp. 306, 311 (E.D.Ky.1996) (holding that plaintiff's one-day absence "could never qualify" under the regulatory definition because the period of incapacity never lasted more than three days). Plaintiff's absences on May 6 and May 7 lasted two days. On May 8, the very next day, plaintiff worked a full shift. The next day, plaintiff was not scheduled. Then, on May 10, even though he was not scheduled, plaintiff volunteered to work and in fact worked a full twelve hours performing his normal duties. Plaintiff was not scheduled the following two days, but on May 13, plaintiff was scheduled and arrived at his normal starting time intending to work the entire day. Therefore, at most, plaintiff's incapacity lasted only two consecutive days. As such, plaintiff cannot, as a matter of law, establish that he was incapacitated (i.e., unable to work) for more than three consecutive days.

Plaintiff attempts to argue that he had a serious medical condition based on Dr. Shetlar's completion of the FMLA form. Without knowing that plaintiff already had returned to work, Dr. Shetlar indicated on the form that plaintiff's serious medical condition began on May 5, 1999 and would last until May 16, 1999 and that plaintiff would be unable to perform his job functions until that time. Plaintiff contends that, in completing this form, Dr. Shetlar provided medical certification that plaintiff had a serious medical condition through May 16, 1999.

Plaintiff further asserts that defendant is legally precluded from challenging Dr. Shetlar's medical certification because defendant failed to exercise its right of requiring plaintiff to obtain second and third medical opinions. Under the FMLA, if an employer has reason to doubt the validity of an employee's initial certification, the employer may require the employee to obtain a second and possible third medical opinion. See 29 U.S.C. § 2613. This has been construed to require that an employer be bound by an initial certification if that employer failed to challenge the certification by requiring one or two more medical opinions. *Miller v. AT & T*, 60 F.Supp.2d 574, 580 (S.D.W.Va.1999); *Sims v. Alameda–Contra Costa Transit Dist.*, 2 F.Supp.2d 1253, 1263 (N.D.Cal.1998). In Miller, the court held that, "upon the submission of a **sufficient** medical certification, an employee is entitled to 'FMLA protection **unless and until** there is contrary medical evidence.'" *Miller,* 60

F.Supp.2d at 580 (emphasis supplied) (citing *Sims*, 2 F.Supp.2d at 1262).

Unlike Miller and Sims, this case involves a medical certification which the certifying doctor admitted contained incorrect information. Thus, the court cannot conclude that plaintiff's medical certification was sufficient under the law. Moreover, in both Miller and Sims, neither respective employer possessed any contrary medical evidence in determining that the employee was not entitled to FMLA protection. In such cases, the employer has a duty to request a second medical opinion if that employer doubts the employee's condition. On the other hand, defendant in this case had contrary medical evidence—the first note from Dr. Shetlar stating that plaintiff should be excused from work on May 7 only. Defendant also knew that plaintiff had in fact worked May 8, May 10, and had reported to work on May 13. Thus, defendant was aware of facts that were directly contrary to Dr. Shetlar's post-termination certification. Accordingly, the court finds that defendant is not bound by Dr. Shetlar's certification that plaintiff had a serious health condition through May 16, 1999.

In challenging Dr. Shetlar's certification, defendant argues that the certification provides insufficient proof that plaintiff had a serious health condition through May 16, 1999. The court agrees. Foremost, Dr. Shetlar based his opinion on erroneous information. Indeed, Dr. Shetlar later admitted that the certification was incorrect and that he had merely made a generalization that plaintiff would be better ten days from his initial visit. Such speculation is insufficient to prove the existence of a serious health condition. See *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D.Tenn.1995) ("[S]peculation that it was reasonable for someone to miss three or four days for her type of illness is insufficient to prove that the absence was necessary."). Dr. Shetlar also later testified that the only absences that were medically necessary were May 6 and May 7, which coincides with Dr. Shetlar's first note excusing plaintiff for only

those days. Thus, contradictory medical evidence exists. See *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 476 (D.Kan.1996) (holding that plaintiff unable to prove as a matter of law FMLA protection because plaintiff's assertions of inability to work were insufficient and contradicted by medical evidence). Most significant, however, is the fact that plaintiff actually worked on May 8, May 10, and reported to work on May 13. The court finds that Dr. Shetlar's certification is not sufficient evidence upon which a jury could find that plaintiff was unable to perform the functions of his job for more than three consecutive days.

Plaintiff has failed as a matter of law to establish that he had a serious health condition entitling him to leave under the FMLA. Plaintiff was never incapacitated for more than three consecutive days, which is required under the regulations to prove the existence of a serious health condition. Moreover, Dr. Shetlar's certification is wholly insufficient to prove otherwise. Defendant is entitled to summary judgment on plaintiff's FMLA claim.

**B. Implied Contract of Employment**

█ Plaintiff alleges that there was an implied contract of employment between him and defendant such that plaintiff could only be terminated for good cause. Plaintiff points to defendant's progressive disciplinary policy, citing the fact that defendant never deviated from the policy, as evidence of an implied contract. Plaintiff also asserts that the employee surveys, which he claims showed that Exide employees overwhelmingly believe that they have job security so long as they perform their job in a satisfactory manner, support his argument that an implied contract existed.

The Tenth Circuit has recognized that Kansas courts hold that the existence of an implied contract is normally a factual issue heavily dependent on the intent of the parties. *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1138 (10th Cir.1994)

**1272**

(citing *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 815 P.2d 72, 80 (1991)). As such, summary judgment remains "rarely appropriate" in cases where the existence of an implied contract is at issue. *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir.1995). For purposes of the motions at issue in this case, the court assumes, without deciding, that an implied contract existed. The court, however, finds that defendant terminated plaintiff's employment for good cause and, as a result, did not breach any such contract.

The court already has found that plaintiff cannot establish that his absences on May 6 and May 7 were covered by the FMLA. Thus, those absences were properly considered one absence occurrence. Having accumulated three absence occurrences within ninety-days, and within six months of his February 1999 suspension, plaintiff violated defendant's attendance policy. Indeed, plaintiff admits that he violated defendant's attendance policy and that defendant followed the appropriate disciplinary steps.

Furthermore, Mr. Peterson testified that an employee who violates the company attendance policy is not performing his duties in a satisfactory manner and that other employees have been discharged for excessive absenteeism in violation of the policy. Plaintiff has failed to point to any evidence in the record to establish that his discharge violated any applicable policy. Accordingly, defendant is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that plaintiff's motion for partial summary judgment (Doc. 33) is denied and defendant's motion for summary judgment (Doc. 30) is granted.