Craig **BRUNELLE**, Plaintiff

v.

**CYTEC PLASTICS, INC.,**
**et al., Defendants**

**No. CIV. 01–292–P–H.**

United States District Court,
D. Maine.

Sept. 30, 2002.

Decision on Defendants' Motion for Summary Judgment. The plaintiff filed an objection to the Recommended Decision on September 9, 2002. I have reviewed and considered the Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore **ORDERED** that the Recommended Decision of the Magistrate Judge is hereby **ADOPTED**. The defendants' motion for summary judgment is **GRANTED** with respect to defendant Bourque as to all claims against him; **GRANTED** with respect to the remaining defendants as to Count II and that portion of Count III alleging retaliatory job termination; and otherwise **DENIED**.

So **ORDERED**.

Jeffrey Neil Young, McTeague, Higbee, Macadam, Case, Watson & Cohen, Topsham, ME, for Plaintiff.

Melissa A. Hewey, Drummond, Woodsum & MacMahon, Portland, ME, for Defendants.

### ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on August 20, 2002, with copies to counsel, his Recommended

### RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [1]

David M. COHEN, United States Magistrate Judge.

Defendants Cyro Industries ("Cyro"), William Bourque, Floyd Phillips, Drew Scott and Mike Blokland (collectively, "Defendants") move for summary judgment as to all claims against them in this action alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and its state-law counterpart, the Maine Family Medical Leave Requirements law ("MFMLR"), 26 M.R.S.A. § 843, *et seq.* Defendants' Motion for Summary Judgment, etc. ("Defendants'

---

**1.** Defendant Cyro Industries was substituted for defendant Cytec ec Plastics, Inc. d/b/a Cyro Industries. *See* Unopposed Motion To Drop Cytec Plastics, Inc. and Add Cyro Industries as a Defendant (Docket No. 11) & endorsement thereon.

Motion") (Docket No. 7) at 1–2; Complaint and Demand for Jury Trial ("Complaint") (Docket No. 1) ¶ 1. For the reasons that follow, I recommend that the Defendants' Motion be granted with respect to Bourque as to all claims against him, granted with respect to the remaining defendants as to Count II and that portion of Count III alleging retaliatory job termination, and otherwise denied.

## I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the non-

movant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant to this recommended decision:

Cyro operates a manufacturing plant in Sanford, Maine that manufactures plastic products using cell-cast and extrusion processes. Defendants' Statement of Material Facts Not in Dispute ("Defendants' SMF") (Docket No. 8) ¶ 1; Plaintiff's Opposition to Defendants' Statement of Material Facts and Plaintiffs' [sic] Statement of Material Facts Not in Dispute ("Plaintiff's Opposing SMF") (Docket No. 13) ¶ 1.[2] The Sanford plant operates 24 hours a day in four shifts, two during the day and two at night. *Id.* ¶ 2. Richard Healy is the plant manager of the Sanford plant. *Id.* ¶ 3. There are two manufacturing buildings at Cyro. *Id.* ¶ 4. One manufactures goods using the cell-cast process and the other, the "Giebel Building," manufactures products using the extrusion process. *Id.* Drew Scott is the building manager of the Giebel

---

**2.** Brunelle's statement of material facts contains two separately numbered sections: responsive facts numbered paragraphs 1–57 on pages 1–7, which I will term "Plaintiff's Op-

posing SMF," and additional facts numbered paragraphs 1–70 on pages 7–15, which I will term "Plaintiff's Additional SMF."

Building and reports directly to Healy. *Id.* ¶¶ 5–6. Mike Blokland is the production superintendent of the Giebel Building and reports to Scott. *Id.* ¶¶ 7–8. Floyd Phillips is the human resources manager. *Id.* ¶ 51.

Craig Brunelle worked for Cyro from 1984 until his termination on March 29, 2001. Plaintiff's Additional SMF ¶ 11; Defendants' Reply Statement of Material Facts ("Defendants' Reply SMF") (Docket No. 16) ¶ 11. During the time period relevant to this action, Brunelle worked on "Night Shift 2" from 7 p.m. to 7 a.m. under the supervision of William Bourque, who was then a production supervisor. Defendants' SMF ¶ 14; Plaintiff's Opposing SMF ¶ 14. Brunelle's schedule was Sunday, Tuesday, Friday and Saturday one week and Monday, Wednesday and Thursday the next. *Id.*

In the six-month period prior to March 2001 Brunelle received two written warnings. Defendants' SMF ¶ 15; Deposition of Floyd Phillips ("Phillips Dep."), filed with Defendants' Motion, at 22–23. On September 23, 2000 Brunelle received a written warning for a quality production issue. Plaintiff's Additional SMF ¶ 14; Defendants' Reply SMF ¶ 14. This warning was issued more than six months prior to Brunelle's termination. *Id.* And on November 5, 2000 Brunelle received a warning for an attendance issue. Defendants' SMF ¶ 15; Phillips Dep. at 19–20; Letter dated November 5, 2000 from William Bourque to Craig Brunelle, marked as Exh. 2 to Phillips Dep., filed with Defendants' Motion. The November 5, 2000 warning for attendance expressly stated, "Furthermore, any more absences before April 4, 2001 will result in a Final Warning." Plaintiff's Additional SMF ¶ 15; Defendants' Reply SMF ¶ 15.

Brunelle's attendance problems were due, at least in part, to issues surrounding child care. Defendants' SMF ¶ 17; Plaintiff's Opposing SMF ¶ 17. Bourque worked with Brunelle to make it possible for him to take vacation time, rather than be absent, when child-care issues arose. *Id.* ¶ 18. As Bourque explained it, "The supervisor is given a little leeway as long as we make sure the shift is working properly and we're making the proper amount of materials we give them a little bit of leeway. I knew Craig had problems with some of the things that were going on so I worked with him as much as I could staying within the gray area." *Id.* Prior to his termination from Cyro, Brunelle had no problems with Bourque. *Id.* ¶ 19.

On January 30, 2001 Brunelle's father, Richard Brunelle, was rushed to Maine Medical Center after being rescued from a serious house fire. Plaintiff's Additional SMF ¶ 1; Defendants' Reply SMF ¶ 1. Richard Brunelle remained hospitalized in the intensive care unit for a number of months, during which time doctors performed a series of surgeries in an attempt to save his life. *Id.* ¶ 2. His health waxed and waned, and eventually he died from complications related to his injuries. *Id.* ¶ 3. According to Dr. Brad Cushing, Brunelle was constantly at his father's bedside throughout this period to make decisions regarding his father's care. *Id.* ¶ 4.

Shortly after the accident, Brunelle called Bourque at home to report what had happened. Defendants' SMF ¶ 21; Plaintiff's Opposing SMF ¶ 21. Bourque told him to take care of matters with his family and not to worry about his job. *Id.* Cyro granted Brunelle family medical leave to be out of work continuously in February 2001 to attend to his father. Plaintiff's Additional SMF ¶ 5; Defendants' Reply SMF ¶ 5. Although Cyro granted Brunelle family medical leave, Bourque told Brunelle he "was concerned with [his] attendance, that [he] had missed time[.]" *Id.* ¶ 6;

*see also* Plaintiff's Opposing SMF ¶ 23; Deposition of Craig A. Brunelle ("Brunelle Dep."), filed with Defendants' Motion, at 21. In a February 1, 2001 memorandum, Bourque wrote, "I discussed how we would handle the time off with Craig. His attendance is not the best and he cannot afford the sick time." Plaintiff's Opposing SMF ¶ 23; E-mail dated February 1, 2001 from William G. Bourque to Michael H. Blokland and Constance G. Bone, marked as Exh. 6 to Phillips Dep., filed with Defendants' Motion.[3]

Bourque did not discourage Brunelle from taking FMLA leave and in fact was supportive of Brunelle's situation. Defendants' SMF ¶ 25; Plaintiff's Opposing SMF ¶ 25. Bourque started filling out the paperwork for Brunelle to take FMLA leave. *Id.* ¶ 24. Bourque appeared concerned about Brunelle and his family and did not seem angry that he was going to be out of work. *Id.* ¶ 26.

Brunelle's father started to recover in March, and Brunelle therefore decided that he would return to work unless some medical situation required him to be at the hospital. *Id.* ¶ 29. He reported for work on March 5, 2001, but the plant was closed because of a snowstorm. *Id.* ¶ 30. He was paid for that day and the following day when the plant remained closed. *Id.* He worked a full shift during the week of March 11, 2001. *Id.* During the following week, he switched shifts with a co-worker so that he could attend a family wedding. *Id.* ¶ 31. He was therefore scheduled to work on March 21 and 22. *Id.* ¶ 32. Brunelle worked on Wednesday, March 21. Plaintiff's Additional SMF ¶ 16; Defendants' Reply SMF ¶ 16. On March 22, Richard Brunelle's condition worsened and Brunelle accordingly called in to Cyro to say that he would be at the hospital and would not be at work. Defendants' SMF ¶ 33; Plaintiff's Opposing SMF ¶ 33. As a result, he was out on FMLA leave that day. *Id.*

Brunelle attended the wedding on March 24, 2001. *Id.* ¶ 34. He worked the next day, March 25, and called Bourque at home. *Id.* ¶¶ 35–36. He advised Bourque that his father's doctors would be meeting the next day to see if his father was well enough to have surgery and that accordingly he probably would not be in on his next scheduled work day, Wednesday, March 28, 2001. Plaintiff's Additional SMF ¶ 21; Brunelle Dep. at 32–33, 35.[4] According to Brunelle, Bourque responded, "If I [Brunelle] wasn't there, he [Bourque] would know why." Plaintiff's Additional SMF ¶ 22; Brunelle Dep. at 35.[5]

---

3. The Defendants' account of this conversation differs: that Bourque "let [Brunelle] know that we weren't going to be using his attendance, we were going to rely on the Family Medical Leave Act for his time off. [Bourque] didn't want [Brunelle] to worry about his job, [he] wanted him to take time and care for his father not his job. [Brunelle] had other things on his mind." Defendants' SMF ¶ 23; Deposition of William Bourque ("Bourque Dep."), filed with Defendants' Motion, at 36. Further, according to the Defendants, Bourque told Brunelle that "we weren't going to worry about his attendance, we would be leaning on the FMLA." Defendants' SMF ¶ 23; Bourque Dep. at 38.

4. Specifically, Brunelle advised Bourque that his father probably would require surgery, which was why he likely would not be at work that day. Defendants' Reply SMF ¶ 21; Plaintiff's Answers to Defendants' First Set of Interrogatories, attached to Defendants' Reply SMF, ¶ 4.

5. The Defendants deny that Bourque said this. Defendants' Reply SMF ¶ 22; Bourque Dep. at 55. Instead, according to the Defendants, Bourque told Brunelle to keep him posted, Defendants' SMF ¶ 40; Bourque Dep. at 55–56, a fact they maintain is effectively undisputed despite Brunelle's attempt to deny it, Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Defendants' Reply") (Docket No. 15) at 3 & n. 1.

On Monday, March 26, 2001, Brunelle and his sister, Maxime Gagne, spent the day at the hospital with their father. Plaintiff's Additional SMF ¶ 23; Defendants' Reply SMF ¶ 23. The surgeons determined that Richard Brunelle was not well enough to have surgery and that they would evaluate his condition on a day-by-day basis. Plaintiff's Additional SMF ¶ 24; Brunelle Dep. at 37.[6] Brunelle spent the day at the hospital on Tuesday, March 27; again, Richard Brunelle's condition did not permit surgery. Plaintiff's Additional SMF ¶ 25; Brunelle Dep. at 40; Deposition of Brad M. Cushing, M.D., attached as Exh. 4 to Plaintiffs' [sic] District of Maine Local Rule 26(c) List of Documents ("Plaintiff's Documents") (Docket No. 14), at 10–11.[7] Brunelle did not call anyone at Cyro on March 27 to advise that he would not be at work the following day. Defendants' SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.

On March 26 and 27, Bourque met with Scott, Blokland, Phillips, Connie Bone and four production-line supervisors to discuss a reduction in force. Plaintiff's Additional SMF ¶ 26; Defendants' Reply SMF ¶ 26. Cyro had determined to eliminate four positions. Id. ¶ 27. The supervisors ranked each employee; Bourque ranked Brunelle higher than did Scott, Blokland and Phillips. Id. ¶ 28. Brunelle had the fifth lowest cumulative score and thus was not slated to be displaced. Id. ¶ 29.

At about 7 a.m. on March 28, Brunelle returned to the hospital. Id. ¶ 30. Although Brunelle usually drove and picked up his sister, on this particular date his sister drove because she was in town. Id. ¶ 31. At approximately 3:30 p.m. that day, Bourque drove by Brunelle's home and saw his truck parked in the yard. Id. ¶ 32. Bourque wrongly assumed that Brunelle was home. Id. ¶ 33. Brunelle left the hospital at approximately 5 p.m. on March 28, returned home and then went to Charlie's OTB, where he met his girlfriend with a group of friends. Id. ¶ 34.[8] Brunelle did not go to work because he had been at the hospital and had not slept all day. Id. ¶ 35.[9] Because Richard Brunelle's condi-

---

Nonetheless, Brunelle does effectively deny this statement with a citation to a portion of his deposition in which, when asked what Bourque said, he testified that Bourque's response was, "if I [Brunelle] wasn't there, he [Bourque] would know why," making no mention that Bourque asked to be kept posted. *See* Plaintiff's Opposing SMF ¶ 40; Brunelle Dep. at 35–36. This, in turn, is not necessarily inconsistent with Brunelle's further deposition testimony that he did not recall whether, on the date in question, Bourque did or did not ask to be kept posted. *See* Brunelle Dep. at 42, 61–62.

**6.** The Defendants protest that the deposition testimony cited in support of this statement is inadmissible hearsay and that, in any event, Brunelle only testified that he was "pretty sure" of this information. Defendants' Reply SMF ¶ 24. The testimony in question fairly can be read as reflecting Brunelle's understanding based on his direct participation in the care of his father. The qualifier that Brunelle was "pretty sure" is not significant enough to undercut the force of the statement.

**7.** Although the Defendants assert that Dr. Cushing could not testify as to what occurred without his notes, Defendants' Reply SMF ¶ 25, Dr. Cushing was able to testify generally regarding Richard Brunelle's condition, *see, e.g.,* Cushing Dep. at 10–11.

**8.** Charlie's OTB is a local bar. Defendants' SMF ¶ 45; Plaintiff's Opposing SMF ¶ 45.

**9.** Brunelle proffers two additional reasons why he did not go to work on the day in question: that he "already had called Bourque to say he probably wouldn't be in because of his father's condition" and "was not prepared in addition to work a 12–hour shift." Plaintiff's Additional SMF ¶ 35 (citing Brunelle Dep. at 48; Affidavit of Craig Brunelle ("Brunelle Aff."), attached as Exh. 8 to Plaintiff's Documents, ¶¶ 3–4). As suggested

tion had deteriorated, surgery had to be postponed until April 1, 2001. *Id.* ¶ 9.[10]

When Brunelle did not report for work as scheduled, Bourque telephoned his home at approximately 6:50 p.m. and left a message on the answering machine when there was no answer. Plaintiff's Additional SMF ¶ 36; Defendants' Reply SMF ¶ 36. Later that evening, Bourque met with employees to announce the displacements. *Id.* ¶ 37. No attempt was made to notify Brunelle of the displacement meeting scheduled for the evening of March 28. *Id.* ¶ 38. Following the meeting, the operators who were affected by the displacements were allowed to leave early. *Id.* ¶ 39. Charlie's OTB and Pat's Pizza are in the same building. *Id.* ¶ 40. One of the affected employees, Scott Fournier, saw Brunelle or his car at Pat's Pizza and telephoned the plant to advise Bourque. *Id.* ¶ 41. Bourque drove to Pat's Pizza, observed Brunelle drinking with several individuals, and left without speaking to Brunelle. *Id.* ¶ 42. Bourque returned to Cyro at approximately 9 p.m. and informed Scott and Blokland that he had seen Brunelle at Pat's Pizza. *Id.* ¶ 43. Brunelle got home at approximately 11 p.m. and called the plant in response to Bourque's message. *Id.* ¶ 44. He spoke with backup supervisor Jim Carlson inasmuch as Bourque had gone home. *Id.* ¶ 45. Brunelle told Carlson that there were issues with Brunelle's father about which Bourque knew because he had discussed them with Bourque on Sunday, March 25. *Id.* ¶ 46.

Carlson relayed the message to Bourque at approximately 11:45 p.m. *Id.* ¶ 47. Bourque in turn left a voicemail for Blokland advising that Brunelle had spoken to Carlson. *Id.* ¶ 48.

On Thursday, March 29, Scott, Blokland and Phillips met with Healy in Healy's office. *Id.* ¶ 49. At that meeting, the Cyro supervisors discussed disciplinary options and the fact that Brunelle had two prior written warnings. *Id.* ¶ 50. The supervisors determined to have Bourque contact Brunelle about why he had been absent the previous day. *Id.* ¶ 51. At that time, Blokland and possibly Scott both were aware based upon Brunelle's conversation with Carlson the prior evening that Brunelle's explanation for his absence was that he already had notified Bourque the prior Sunday that he probably would not be in because of his father's condition. *Id.* ¶ 52.

Bourque spoke with Brunelle at about 2 p.m. on Thursday, March 29. *Id.* ¶ 53. After discussing the displacements, Bourque questioned why Brunelle had not been at work the previous evening. Plaintiff's Additional SMF ¶ 54; E-mail dated March 30, 2001 from William G. Bourque to Floyd C. Phillips, Drew R. Scott and Michael H. Blokland, marked as Exh. 9 to Phillips Dep., filed with Defendants' Motion. Brunelle replied "that he had been at the hospital all day visiting his father." *Id.* According to Brunelle, he also reminded Bourque that he had told the supervisor on

by the Defendants, Defendants' Reply SMF ¶ 35, these two explanations, which derive from the Brunelle affidavit, appear to contradict earlier deposition testimony in which, after enumerating specific reasons why he did not go to work, Brunelle stated that there were no other reasons, *compare* Brunelle Aff. ¶ 4 *with* Brunelle Dep. at 48; *see also, e.g., Colantuoni v. Alfred Calcagni & Sons,* 44 F.3d 1, 4–5 (1st Cir.1994) ("When an interested witness has given clear answers to unambigu-

ous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

10. Brunelle's further assertion that surgery was postponed because it "was not feasible" prior to April 1, 2001, Plaintiff's Additional SMF ¶ 9, is neither admitted nor supported by the citation given.

Sunday, March 26, that he probably would not be in. Plaintiff's Additional SMF ¶ 55; Brunelle Dep. at 54.[11] Following the conversation, Bourque reported its substance to Blokland. Plaintiff's Additional SMF ¶ 56; Defendants' Reply SMF ¶ 56. Blokland relayed its substance to Scott, advising Scott that Brunelle had been at the hospital "late" and was asserting that he had discussed with Bourque the prior Sunday that he might not be coming to work on Wednesday. *Id.* ¶ 57. Blokland then initiated a request to terminate Brunelle's employment. *Id.* ¶ 58.

. Under the terms of Cyro's progressive correction action policy, "the **third level of management** above the employee being considered for termination/demotion and the Human Resources Manager, must approve all discharges of non-exempt employees (including production, maintenance, warehouse workers . . .)." *Id.* ¶ 59 (emphasis in original). Scott and Phillips, as well as Healy, subsequently approved the termination. *Id.* ¶ 60. Neither Phillips, Scott, Blokland nor Healy bothered to speak with Brunelle before deciding to terminate him. Plaintiff's Additional SMF ¶ 10; Phillips Dep. at 28; Deposition of Drew Scott, filed with Defendants' Motion, at 40. In another instance when an employee denied wrongdoing, Scott spoke directly with the individual. Plaintiff's Additional SMF ¶ 61; Defendants' Reply SMF ¶ 61.

After Brunelle reported to work on March 29, Bourque asked him to come upstairs. *Id.* ¶ 62. Blokland, Scott, Phillips and Bourque were all present at the meeting. *Id.* ¶ 63. Blokland informed Brunelle that he was terminated for failing to call in the night before. *Id.* ¶ 64. Brunelle told Bourque, "I told you that I

wouldn't be there on Wednesday." Defendants' Reply SMF ¶ 65; Brunelle Dep. at 52. Bourque made no response. Plaintiff's Additional SMF ¶ 66; Brunelle Dep. at 52.

Following the meeting, on March 30, 2001 Scott prepared a memorandum to Phillips. Plaintiff's Additional SMF ¶ 67; Defendants' Reply SMF ¶ 67. The memorandum stated that Brunelle was terminated for "an ongoing attendance problem" and reported that although Brunelle claimed that he was at the hospital "all day" with his father on March 28, in fact, unbeknownst to Brunelle, Bourque had observed Brunelle's truck at home Wednesday afternoon and had seen Brunelle at a bar at about 8:30 p.m. *Id.* The memorandum also indicated that Bourque denied that he had any discussion with Brunelle the prior Sunday about the fact that Brunelle might not be at work on March 28. *Id.*

Brunelle's performance was satisfactory but for his failure to appear for work on March 28. *Id.* ¶ 68. The March 29, 2001 request for termination prepared by Blokland and signed by Scott, Phillips and Healy does not make any reference to the September 23, 2000 written warning for quality issues. *Id.* ¶ 69. The termination notice only references the prior attendance warning and the March 28, 2001 alleged no-call, no-show. *Id.* Bourque would have terminated Brunelle but had no authority even to make such a recommendation. *Id.* ¶ 70; Bourque Dep. at 84.

Prior to his termination, Brunelle had never before been a no-call, no-show for work. Plaintiff's Additional SMF ¶ 12; Defendants' Reply SMF ¶ 12. Although numerous other employees received notices similar to that received by Brunelle

---

11. The Defendants deny that this statement was made. Defendants' Reply SMF ¶ 55; Bo- urque Dep. at 81.

in November 2000, not a single individual other than Brunelle was terminated for violation of Cyro's attendance policy in the five-year period prior to Brunelle's termination; in all other instances, employees received final written warnings. *Id.* ¶ 13.

### III. Analysis

In his three-count complaint, Brunelle alleges that the Defendants (i) denied him leave to which he was entitled on March 28, 2001 and (ii) terminated his employment in retaliation for taking family leave in violation of both the FMLA and the MFMLR. Complaint ¶¶ 19–31. Inasmuch as the parties treat FMLA analysis as dispositive of the merits of the MFMLR claims, I shall do likewise.[12]

 The FMLA "contains two distinct types of provisions," *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998), each of which is implicated by Brunelle's complaint. "First, it creates a series of substantive rights"—including the right of an eligible employee to take up to twelve weeks a year of unpaid leave, intermittently "when medically necessary," to care for a close family member with a "serious health condition." *Id.* This set of rights is "essentially prescriptive, set[ting] substantive floors for conduct by employers, and creating entitlements for employees." *Id.* (citation, footnote and internal quotation marks omitted). "In such cases, the employer's subjective intent is not relevant." *Id.* "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Id.*

 Second, "the FMLA provides protection in the event an employee is discriminated against for exercising [the above-described substantive] rights." *Id.* (footnote and citation omitted). With respect to this "proscriptive group of violations ... the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id.* at 160. In such cases, in the absence of direct evidence of discrimination, the so-called *McDonnell Douglas* burden-shifting paradigm applies. *Id.* As the First Circuit has clarified:

> Under that [*McDonnell Douglas*] framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation. If he does so, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination], sufficient to raise a genuine issue of fact as to whether it discriminated against the employee.... If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.

*Id.* at 160–61 (citations and internal quotation marks omitted). A *prima facie* case of

---

12. As Brunelle notes, the MFMLR provides eligible employees in Maine with rights comparable to those provided by the FMLA, although the remedy differs. Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition") (Docket No. 12) at 8 n. 3. The Law Court has yet to construe the MFMLR; however, this court has seen "no principled basis for dismissing [an MFMLR] claim under circumstances where the parallel federal claim survives the motion to dismiss." *Perry v. Community Health & Counseling Servs.*, Civil No. 01–17–B–H, 2001 WL 225018, at *2 (D.Me. Mar. 5, 2001) (rec. dec., *aff'd* Apr. 3, 2001).

retaliation in violation of the FMLA is made out by a showing that an employee "(1) . . . availed himself of a protected right under the FMLA; (2) . . . was adversely affected by an employment decision; [and] (3) [that] there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Id.* at 161.

## A. Denial of Leave

■ In Counts I and III of his complaint, Brunelle alleges that although he gave Bourque and Cyro "as much notice as possible," he was wrongly denied FMLA/ MFMLR leave to which he was entitled on March 28, 2001. Complaint ¶¶ 19–23, 28–30. The Defendants counter that (i) the intermittent leave sought was not "medically necessary" inasmuch as Brunelle was not taking care of his father (whose surgery had been postponed) but rather was out drinking with friends, and (ii) in any event, Brunelle did not give adequate notice to trigger the protections of the FMLA. Defendants' Motion at 10–12. The Defendants fail to make a persuasive case of entitlement to summary judgment on either ground.

The first argument—that leave was not "medically necessary"—relies on a crabbed view of the facts. While Brunelle was indeed discovered drinking with friends on the evening of March 28, it is undisputed

that commencing at 7 a.m. that day he undertook a daylong vigil at his critically ill father's bedside, assisting in medical decision-making. On that day, without a doubt, he "provide[d] care or psychological comfort to an immediate family member with a serious health condition." 29 C.F.R. § 825.203(c). No more was required.[13]

■ Nor does the Defendants' second assertion—lack of adequate notice—ultimately avail them, FMLA regulations provide, in relevant part, that whether a leave "is to be continuous or is to be taken intermittently or on a reduced schedule basis, notice need only be given one time, but the employee shall advise the employer as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown." *Id.* § 825.302(a). "As soon as practicable" is defined to mean:

> as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case. For foreseeable leave where it is not possible to give as much as 30 days notice, "as soon as practicable" ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee.

*Id.* § 825.302(b).

The Defendants contend, *inter alia,* that as of Sunday, March 25, with the situation

13. That Brunelle's father did not have surgery on March 28, after Brunelle advised Bourque that his father probably would require surgery and that was why he likely would not be at work that day, is irrelevant. First, the statement on the whole was accurate. The need for surgery was being assessed on a day-by-day basis, Brunelle was playing a role in that decision-making, and his father potentially could have had surgery that day. Second, Brunelle did in fact spend the entire day providing care and comfort to his critically ill father. Nor does it matter that Brunelle technically was available to work, having left the

hospital prior to the start of his shift, and was discovered having drinks with friends instead. It is undisputed that Brunelle had commenced his hospital vigil at 7 a.m. on March 28, had not slept all day, and would have been required to work a twelve-hour shift starting at 7 p.m. It is a reasonable inference that, while he was able to unwind with friends, he was not prepared to work. Further, inasmuch as appears, Cyro had not previously questioned the medical necessity of FMLA leave for Brunelle to undertake vigils similar to that undertaken on March 28, 2001.

"obviously unsettled," Bourque told Brunelle to keep him informed, something Brunelle ultimately failed to do. Defendants' Motion at 11–12. Brunelle counters, and I find, that there are genuine issues of material fact whether Bourque (i) told Brunelle, "If you are not in, I will know why," or (ii) asked Brunelle to keep him posted. *See* Plaintiff's Opposition at 11–12. A trier of fact, crediting Brunelle's version of events, could find that he promptly and adequately apprised Cyro of his anticipated need for leave and reasonably (if mistakenly) interpreted Bourque's equivocal response to mean that no further notice was necessary.

■ In countering the Defendants' motion for summary judgment on the issue of denial of FMLA leave, Brunelle makes another argument meriting discussion: that, beyond denying summary judgment to the Defendants, the court should enter summary judgment *sua sponte* for him. Plaintiff's Opposition at 10–11 & n. 5. He posits that this is so inasmuch as he advised Carlson, Bourque and the Defendant supervisors on March 28 and 29 that he had been at the hospital all day on March 28—"within one or two business days." *Id.* This is a strained reading of the relevant regulation, omitting two important qualifiers: that the information be impart-

ed "as soon as both possible and practical" after "the need for leave becomes known to the employee."

Arguably, Brunelle knew by the time he talked to Bourque on Sunday, March 25, that he would need to be out the following Wednesday, March 28. At the very least, he knew prior to the start of his scheduled shift—certainly by the time he decided to go to Charlie's OTB, if not much earlier that day—that he would not be going to work that evening. Any notice given on March 28 or 29, subsequent to the start of Brunelle's shift, could not entitle him to summary judgment. *See, e.g., Lewis v. Holsum of Fort Wayne, Inc.,* 278 F.3d 706, 710 (7th Cir.2002) ("[T]he FMLA does not authorize employees on leave to keep their employers in the dark about when they will return.") (citation and internal quotation marks omitted); *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 980 (5th Cir.1998) ("While an employer's duty to inquire [into whether leave qualifies under the FMLA] may be predicated on statements made by the employee, the employer is not required to be clairvoyant.").[14]

For these reasons, the court should (i) deny the Defendants' motion for summary judgment as to Count I and that portion of Count III alleging failure to approve leave,[15] and (ii) decline Brunelle's invitation

---

14. Two cases upon which Brunelle relies, *see* Plaintiff's Opposition at 11 n. 4, are distinguishable. The plaintiff in *Brannon v. Osh-Kosh, B'Gosh, Inc.,* 897 F.Supp. 1028, 1032–33 (M.D.Tenn.1995), not only notified her employer on a Friday that her daughter's illness might prevent her from working Monday, but also called her employer both Monday and Tuesday morning to advise that she would not be in and arranged for delivery of a doctor's note on Monday or Tuesday verifying that her daughter's illness precluded her from working those days. The plaintiff in *Bryant v. Delbar Prods., Inc.,* 18 F.Supp.2d 799, 801 (M.D.Tenn.1998), requested a partial day off to attend to her son, who had been hospitalized the previous day with advanced kidney

failure. In finding the notice given to have been adequate for purposes of the FMLA, the court noted that the plaintiff had "communicated directly with Delbar [her employer] on the day she needed time off, rather than waiting twelve days [as in a distinguishable case], and provided Delbar with concrete, not 'meager,' information as to why she needed time off." *Id.* at 806. Significantly, in both *Brannon* and *Bryant,* the plaintiffs gave unequivocal, concrete notice prior to taking the leave in question that they requested time off.

15. For separate reasons discussed below, I recommend summary judgment as to all claims asserted against one individual defendant, Bourque.

to enter summary judgment *sua sponte* for him as to those claims.

## B. Retaliation

■ In Counts II and III of his complaint, Brunelle alleges that in violation of both the FMLA and the MFMLR the Defendants terminated his employment in retaliation for his usage of family leave. Complaint ¶¶ 24–25, 31. Brunelle does not dispute that, in this case, the *McDonnell Douglas* burden-shifting rubric applies. Plaintiff's Opposition at 12. The Defendants assume *arguendo* that Brunelle makes out a *prima facie* case; he concedes that they make the requisite showing that he was terminated for legitimate, non-discriminatory reasons. Defendants' Motion at 9; Plaintiff's Opposition at 12–13. However, the parties strongly disagree whether Brunelle adduces sufficient evidence of pretext to survive summary judgment. *See, e.g.,* Defendants' Motion at 9–10; Plaintiff's Opposition at 12–15. I am persuaded that the Defendants have the better of this argument.

A "nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason." *Hodgens,* 144 F.3d at 168. "Thus, one way an employee may succeed is to show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence[.]" *Id.* (citations and internal quotation marks omitted).

In attempting to show pretext, Brunelle confronts a significant—and ultimately insurmountable—obstacle in the form of his employer's compelling showing that it terminated his employment on the basis of perceived misconduct. There is no dispute that (i) Bourque appeared supportive of, and approved, Brunelle's initial request for FMLA leave, (ii) on March 22, 2001—just prior to Brunelle's termination—he was given a day of FMLA leave, (iii) apart from the conversation on March 25, Brunelle did not contact Cyro prior to the start of his scheduled shift to say that he would not be in on March 28, (iv) instead of going to work that evening, Brunelle went to Charlie's OTB, (v) when Bourque saw Brunelle's truck parked in his driveway that afternoon, he mistakenly assumed Brunelle was at home (instead of at the hospital), (vi) when Brunelle did not show up for work, Bourque immediately phoned his home, getting his answering machine, (vii) Bourque received a tip that Brunelle was at Charlie's OTB, (viii) Bourque drove to Charlie's OTB and observed Brunelle there having drinks with friends, and (ix) at least some of the Cyro decisionmakers understood that Brunelle's explanation for what they perceived as his "no-show" was that he had been at the hospital "late"—a seeming contradiction with the facts as they knew them. These facts demonstrate (at best for Brunelle) a discharge unfairly based on misunderstanding and misperception, not retaliatory termination predicated on past usage of FMLA leave.

Brunelle struggles to overcome the force of these facts, articulating six reasons why, in his view, he adduces sufficient evidence to raise a triable issue of pretext. *See* Plaintiff's Opposition at 12–15. However, these reasons, which I address in turn, make little headway in undermining the veracity of Cyro's stated reasons for the discharge:

1. That a trier of fact could find Cyro's "no-call, no-show" explanation for Brunelle's termination unworthy of credence, raising an issue of material fact as to pretext, inasmuch as (i) if Brunelle's ver-

sion of his March 25, 2001 conversation with Bourque is credited, Bourque approved his absence on March 28, and (ii) given that Brunelle never was a "no-call, no-show" in his entire eighteen years of employment with Cyro, it is "incredible" that he would have failed to give adequate notice on the occasion in question. *Id.* at 13. As discussed above, a fact-finder crediting Brunelle's testimony and discrediting that of Bourque could indeed find that Bourque approved Brunelle's absence. One then reasonably could infer that Bourque subsequently forgot he gave such approval or even lied about it. Nonetheless, although Bourque played a role in Brunelle's termination, he was not among the decision-makers. The actual decision-makers (Blokland, Phillips, Scott and Healy) were given to believe that Brunelle (i) was at home, not at the hospital tending to his father (based on Bourque's mistaken inference from observation of the truck in the driveway), (ii) was found drinking at a bar subsequent to the start of his shift, and (iii) upon questioning by Bourque, gave the excuse that he had been tending to his father all day, or until late in the day. The decision-makers knew that Brunelle maintained he had obtained Bourque's permission to be out on March 28; however, Bourque denied it. That the decision-makers under these circumstances chose to credit Bourque's story over Brunelle's does not permit a reasonable inference of pretext.

2. That, although Bourque initially approved Brunelle's request for FMLA leave, he expressed concern with Brunelle's attendance, and although Brunelle's November 2000 warning for attendance problems stated that any further absence prior to April 1, 2001 would result in a final written warning, Brunelle received no such final written warning (despite his denial of wrongdoing). *Id.* The fact that Bourque expressed concern with Bru-

nelle's past attendance problems—which had nothing to do with the FMLA—while simultaneously granting FMLA leave cannot reasonably be construed as a sign of discriminatory animus against the taking of such leave. *See, e.g., Hodgens,* 144 F.3d at 172 (holding, *inter alia,* that despite warnings given employee for excessive absenteeism "[n]o rational factfinder could reasonably conclude that GD terminated Hodgens in retaliation for exercising his rights under the [FMLA] statute: the vast majority of Hodgens's absences were not FMLA-protected"). As to the seeming discrepancy between the promised final warning and the termination, the record as a whole makes clear that Brunelle's perceived "no-call, no-show" was an infraction greater in magnitude than the attendance problems in issue in November 2000. Brunelle himself emphasizes that never before in his eighteen years with Cyro had he been a "no-call, no-show."

3. That in the five years prior to Brunelle's termination, not one employee had been terminated for violating Cyro's attendance policy and that, although several employees were terminated when they simply did not appear for work, in instances when employees with attendance problems were notified that they would receive a final written warning, such a warning was received. Plaintiff's Opposition at 13–14. In making this argument, Brunelle effectively concedes that a "no-call, no-show" is regarded at Cyro as a serious enough infraction to justify immediate termination. Brunelle's insurmountable problem is that, on the record presented, a reasonable jury could only conclude that those responsible for the decision to terminate Brunelle's employment sincerely (if mistakenly) perceived Brunelle as having committed such an infraction.

4. That, although the Defendants now contend they terminated Bru-

nelle not just for the alleged no-call, no-show but also for the two previous written warnings, the warning for quality issues (which in any event was more than six months old) was not advanced as a reason for the termination at the March 29 meeting. *Id.* at 14. It is true, as a general matter, that after-the-fact bootstrapping of rationales for adverse employment action can raise an inference of pretext. *See, e.g., Walton v. Nalco Chem. Co.,* 272 F.3d 13, 23 (1st Cir.2001) (noting that "pretext may be established with evidence that nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action") (citation and internal quotation marks omitted). However, in this case, it is undisputed that the Cyro decisionmakers at least discussed both older warnings prior to deciding to discharge Brunelle. In any event, given the strength of the reasons actually advanced at the meeting, the subsequent "bootstrapping" of the older, unrelated warning raises at most a weak inference of pretext.

5. That not one of the four individuals who signed the termination recommendation (Blokland, Scott, Phillips and Healy) even spoke to Brunelle to obtain his side of the story or to advise him that his truck had been seen outside of his home and he had been observed drinking at Pat's Pizza, even though in at least one other instance Scott spoke personally with an employee who asserted that the reasons for termination were mistaken. Plaintiff's Opposition at 14. On this point, Brunelle fails to make a sufficiently strong case of differential treatment to raise any inference of animus or pretext. Inasmuch as appears, Scott's decision to speak with one employee personally was the exception, not the rule. In any event, Brunelle provides in-

sufficient detail to assess whether that employee and he were similarly situated in all material respects. Finally, it is undisputed that Brunelle was given an opportunity (through a conversation with Bourque) to explain his absence.

6. That, inasmuch as Blokland, Scott and Phillips had given Brunelle performance rankings pursuant to which he would have been one of the four displaced employees, one can infer that the Defendants seized upon the alleged no-call, no-show to terminate him. *Id.* at 15. While this may be so, the inference raised is that these Defendants wanted Brunelle fired because they considered him a relatively lower ranking performer than his peers, not because he had used FMLA leave.[16]

Stepping back from the detail of Brunelle's six points, the picture that emerges is one in which an employer has made a notably strong showing that the termination in question was animated by perceived misconduct, to which an employee has responded with a notably weak showing of pretext. In such circumstances, summary judgment in the employer's favor is appropriate. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that, although "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," there are instances where such a showing is inadequate to sustain a finding of liability; "[f]or instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted indepen-

---

**16.** I note that there is no evidence from which one could infer that these rankings were based in whole or in part on Brunelle's use of FMLA leave.

dent evidence that no discrimination had occurred.") (emphasis in original).

For these reasons, the Defendants are entitled to summary judgment as to Count II and that portion of Count III alleging retaliatory discharge.

## C. Liability of Defendant Bourque

 The Defendants make one final argument: that Bourque exercised insufficient control over Brunelle's ability to take protected leave to be subject to FMLA liability, entitling him to summary judgment as to all claims against him. Defendants' Motion at 12.

As Brunelle recognizes, Plaintiff's Opposition at 15, although the First Circuit has yet to address the circumstances under which the FMLA imposes individual liability, courts that have done so most commonly have applied the parallel Fair Labor Standards Act ("FLSA") test, *see, e.g., Morrow v. Putnam*, 142 F.Supp.2d 1271, 1275 (D.Nev.2001) ("The majority of courts have applied ... precedent from the FLSA to find that supervisors may be sued in their individual capacity under the FMLA."). Brunelle looks to relevant First Circuit FLSA caselaw, pursuant to which (he argues) courts must examine whether an individual actor "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Plaintiff's Opposition at 15–16 (citing *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir.1998)). In addition, Brunelle notes, *Baystate* enumerates a fifth factor: whether the individual had personal responsibility for making decisions that contributed to the alleged violation. *Id.* at 16.

The Defendants rejoin that, even assuming *arguendo* that the test described by Brunelle applies, the undisputed facts es-tablish that he fails to meet three of the four prongs. Defendants' Reply at 5. Indeed, there is no evidence that Bourque had the power to hire and fire, determined the rate and method of payment or maintained employment records. The Defendants apparently overlook the fifth prong identified by Brunelle. *See id.* However, even though Bourque arguably had personal responsibility for making decisions that contributed to the alleged denial of leave, as a front-line supervisor—at the bottom of four rungs of management—he simply was not a prominent enough player in Cyro's operations to be considered an "employer" for purposes of the FMLA. *See, e.g., Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir.1983) ("Taking an 'economic reality' approach to the facts of this [FLSA] case, we find that the district court did not err in holding appellants personally liable for the unpaid wages of their 99 hourly employees. Our holding is narrow. We review the liability of corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of nonpayment."); *Keene v. Rinaldi*, 127 F.Supp.2d 770, 777–78 n. 3 (M.D.N.C.2000) (citing *Donovan* for proposition that "neither the FLSA nor the FMLA were intended to impose liability on mere supervisory employees as opposed to owners, officers, etc.").

Bourque accordingly is entitled to summary judgment as to all claims against him.

## IV. Conclusion

For the foregoing reasons, I recommend that the Defendants' Motion be **GRANTED** with respect to Bourque as to all claims

against him, GRANTED with respect to the remaining defendants as to Count II and that portion of Count III alleging retaliatory job termination, and otherwise **DENIED**.

*NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

August 20, 2002.