### Karen CALL, Plaintiff

v.

### FRESENIUS MEDICAL CARE HOLDINGS, INC. and Bio–Medical Applications of Massachusetts, Inc., Defendants.

### Civil Action No. 05–30245–MAP.

United States District Court,
D. Massachusetts.

Feb. 1, 2008.

Jennifer Belli, Goulston & Storrs, Kenneth M. Bello, Josiah M. Black, Bello, Black & Welsh, LLP, Boston, MA, for Defendants.

Suzanne Garrow, Heisler, Feldman & McCormick, P.C., Springfield, MA, for Plaintiff.

Mary J. Kennedy, Bulkley, Richardson & Gelinas, Springfield, MA, for Interested Party.

***MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND MOTIONS TO STRIKE*** (Dkt Nos. 37, 44, 53 & 58)

PONSOR, District Judge.

## I. INTRODUCTION

After plaintiff Karen Call took leave to care for her adult daughter, Defendants

Fresenius Medical Care Holdings, Inc. ("Fresenius") and Bio–Medical Applications of Massachusetts, Inc. ("Bio–Medical"), her employers, fired her upon her return from that leave, citing her history of unauthorized leave and her failure to keep them updated as to her status. Call charges Defendants with violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2615(a)(1) and (2), based on their refusal to grant her medical leave and her subsequent discharge (Count I), as well as breach of contract for the contravention of Bio–Medical's written leave policies (Count II).

Defendants have brought a Motion for Summary Judgment as to all of Call's claims. (Dkt. No. 37, Def.'s Mot. for Summ. J.) Call has in turn filed a Motion for Partial Summary Judgment as to her claim of interference with her FMLA rights. (Dkt. No. 44, Pl.'s Mot. for Partial Summ. J.) For the reasons stated below, Plaintiff's motion will be denied and Defendants' motion will be allowed in part. Though the evidence proffered by Plaintiff is barely enough to survive summary judgment, she has alleged sufficient facts that a jury must hear and judge the credibility of her claims.

## II.  FACTS [1]

As is proper on cross-motions for summary judgment, the following overview sets out the undisputed facts, with any material disputes noted and construed in the light most favorable to the relevant non-moving party.  *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 8 (1st Cir.2006).

## A.  *Call's Employment History*

Karen Call began her tenure as an at-will employee at Yankee Family Dialysis ("the Yankee clinic"), a dialysis clinic in Greenfield, Massachusetts, in 1988. Defendants did not enter into any relationship with the clinic or Call until September 1997, when Plaintiff began work as a "leased" employee of Bio–Medical. She became a formal employee of Bio–Medical in spring 2001 when it took over the Yankee clinic.

Call worked at various times as both a patient care technician and an equipment technician. As a patient care technician, Call would assist nurses in providing dialysis services, while as an equipment technician she would perform preventative maintenance and repair on dialysis equipment.

Between 1988 and 2003, Call was supervised by Mary Ann Kleeberg, Director of Nursing at the Yankee clinic. Beginning in March 2003, Call came under the supervision of Michael Young. Young had become the Regional Technical Manager (also known as the Area Chief Technician) pursuant to Bio–Medical's switch to regional management of all technical positions, and generally spent about one day a week at the Yankee facility. According to Defendants, he was Call's direct supervisor from this point on. In January 2004, Nancy Shea took over Kleeberg's position as Director of Nursing.

During the course of her employment, Call received mixed evaluations. In 2001, Kleeberg's performance evaluation of Call indicated that she consistently provided effective assistance and worked well with co-workers. Kleeberg's March 2002 evalu-

---

1.  Unless another source is cited, the following facts are drawn from Dkt. No. 38, Defs.' Local Rule 56.1 Statement of Undisputed Material Facts; Dkt. No. 42, Pl.'s Statement of Material Facts as to Which There Exists a Genuine Dispute; Dkt. No. 46, Pl.'s Statement of Mate-rial Facts as to Which There is No Genuine Dispute; Dkt. No. 47, Pl.'s Resp. to Defs.' Statement of Material Facts; and Dkt. No. 54, Defs.' Resp. to Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute.

ation of Call noted that she was hardworking and a valuable member of the dialysis team. She received two promotions and several raises.

However, Call also had frequent attendance problems. Kleeberg first communicated this issue to Kathryn Dickey, the Area Administrator overseeing the Yankee clinic and others in the region, when Dickey began supervising the clinic in 1999. Between February and May 2002, Kleeberg discussed attendance issues with Plaintiff on several occasions. In May 2002, Call received a performance evaluation scoring her 0 out of 10 on attendance and punctuality, due to ten unauthorized absences during the previous year. She also received a written warning regarding her unauthorized absences in May 2002, stating that over seven such absences per year was unsatisfactory. This rebuke was followed by a written warning in September 2002 after Call took other unauthorized leave between May and September 2002. Meanwhile, Plaintiff had taken authorized FMLA leave between August 2 and August 22, 2002.

Call continued to have attendance problems in 2003, reporting late on several occasions. In February 2003, she was suspended for three days without pay after a "no-call/no-show" on February 24 in which she called several times promising to come in at some point during the day but never showed up. In a meeting with Call regarding this suspension, Kleeberg explained that further unexcused absences would lead to termination of her employment and that her attendance would continue to be monitored. Kleeberg mentioned Call's pattern of Monday and Friday absences, as well as the need for her to phone her supervisors directly and personally (her husband had called on previous occasions) to notify them of absences.

Young took over Call's evaluations as of March 2003. He noted her attendance difficulties in an April 2003 written evaluation in which Call again received a 0 out of 10 for attendance and punctuality. In a subsequent meeting with Call that month, Young and Kleeberg emphasized the importance of "calling in" and Young instructed Call to contact him rather than the Director of Nursing regarding any absences.[2]

On April 14, 2003, disregarding Young's admonition, Call phoned Kleeberg at home at 1:15 a.m. to report an absence, stating that her husband was sick due to alcoholism and had fallen and broken the toilet, flooding her home. Call took intermittent leave under the FMLA in connection with this and related incidents between April 12 and October 12, 2003. Plaintiff concedes she was not formally disciplined or criticized for taking any FMLA leaves or other excused absences before the incident precipitating this suit occurred in early 2004.

In the aftermath of the April 14 call, Young initially wanted to issue Call a written reprimand for failing to contact him rather than Kleeberg to report her absence. However, he was advised not to do so by Bio–Medical's human resources department and instead merely reminded Call of the correct protocol verbally. Between April 2003 and January 2004, Young also had two meetings with all the equipment technicians he supervised in the region, including Call, at which he instructed all of them to call him directly regarding any absences. Young provided the technicians with his cell phone number and beeper number, which were also posted on the

2. Written company policy states that an employee may call either the location manager or her supervisor to report an absence.

technician's schedules and in the technical office at each location Young supervised.

Young expressed some worries about Call's technical competency as well as her attendance, specifically citing her level of knowledge about the equipment and her performance of preventative maintenance. He spoke to Call about several relevant incidents and noted them on her April 2003 written performance evaluation.

## B. Call's Termination

On December 25, 2003, Jennifer Call, Karen Call's twenty-one year-old daughter, arrived at her mother's home complaining of stomach pain, vomiting, and fever.[3] She stayed at Plaintiff's home until December 29. On that day, Call received a telephone call at work informing her that her daughter was at the emergency room of the Franklin Medical Center complaining of fever, nausea, and vomiting blood. Kleeberg gave Call permission to join Jennifer at the hospital.

An examination of Jennifer Call revealed that she was nineteen weeks pregnant. She was also diagnosed with non-serious bleeding from her upper gastrointestinal tract. She was discharged from the emergency room on the 29th without being admitted to the hospital.

Karen Call took her daughter to her (Jennifer's) home and left her there for the night. Jennifer returned to Karen Call's care on December 30 and spent every night from then until January 2 in her mother's home due to her vomiting, fever, pain, and difficulty walking. Call helped her daughter with eating, bathing, and other activities. Call observed that Jennifer seemed emotionally unstable during this time and that she experienced abdominal pain when she tried to sit upright in a car seat.

Jennifer decided to terminate her pregnancy. In late December, Call asked Kleeberg for time off to accompany her daughter to Boston Medical Center ("BMC"), where the abortion procedure would be performed. Kleeberg, who was leaving her job that month, gave Call permission to take time off to care for her daughter with the caveat that she should keep "people posted" as to her status. (Dkt. No. 38, Ex. G, Kleeberg Dep. 79:18–80:1.) According to Plaintiff, she specifically asked for and was granted leave through January 8 by Kleeberg and Young.[4] (Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 105:3–109:21.) Kleeberg did not recall whether she approved specific dates for Call's absence. (Dkt. No. 38, Ex. G, Kleeberg Dep. 25:16–29:19.) Kleeberg did remember informing Nancy Shea, her incoming replacement, that Call would be on leave to care for her daughter.

Call informed Young verbally of her need for time off. (Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 162:20–164:22.) According to Plaintiff, she also faxed Young a written request to obtain leave through January 8. (Id. at 110:1–7; Dkt. No. 48, Aff. of Karen Call ¶ 13.) Young denies receiving any such fax. (Dkt. No. 52, Second Aff. of Michael Young ¶ 1.)

The Calls reported to BMC on January 2, 2004 for a physical examination of Jennifer and a discussion of the abortion procedure. Jennifer was administered medication to terminate her pregnancy on January 5 at BMC. She stayed at the

---

3. The record with respect to this series of events is somewhat sparse due to the fact that none of the parties have been able to locate Jennifer Call to provide testimony in this case. Apparently she has become estranged from her parents, and they are unable to reach her.

4. In support of this assertion, she offers her desk calendar for the period, on which she marked that she had leave January 2 through January 8. (Dkt. No. 38, Ex. D, Karen Call Dep. Part II at 177:14–179:11; Dkt. No. 48, Aff. of Karen Call, Ex. A.)

hospital and was formally admitted on January 6, with the reason for admission recorded as "acute situational anxiety of pregnancy" and Jennifer reporting a pain level of seven on a one to ten scale. (Dkt. No. 38, Ex. CC at 6.) At that time, a healthcare provider took her history and performed a medical exam.

On January 6, Call phoned Nancy Shea, who had just taken over for Kleeberg as Director of Nursing. Call informed Shea that her daughter was having an abortion (which Shea had not known, although she was aware that Call was out caring for her daughter) and said her daughter was having complications. Call told Shea that Jennifer would be discharged from the hospital on January 7 and that she would not be able to attend work that day.

Jennifer spontaneously passed the fetus at approximately 11 p.m. on January 6 and reported that she experienced no pain or nausea overnight and was able to walk to the bathroom. A nurse told Call that Jennifer was "bleeding pretty good" and needed to "have something done the following day." (Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 122:18–23.) Jennifer was scheduled to undergo a dilation and evacuation procedure the morning of January 7 to remove the retained placenta, but she delivered the placenta spontaneously and did not need the procedure.

Jennifer was discharged from the hospital the morning of January 7 with a few restrictions on her activities, including six weeks of "pelvic rest," a prohibition on

driving for twenty-four hours, and the instruction not to engage in heavy lifting for two weeks. Call stated in her deposition that at the time of her discharge, Jennifer could not walk or go to the bathroom without help.

Call again phoned Shea on January 7, reporting that she was still in Boston and would try to come in late on January 8 to undertake a certain disinfection task that she was scheduled to perform.[5] Shea told Call that she must contact Young regarding the situation and that he was at the Yankee clinic. (Shea was at a different clinic for the day.) Call did not try to call Young on his cell phone or beeper nor did she ask anyone for those numbers. Call did allege in her answers to Defendants' interrogatories that she called both another clinic and her own clinic looking for Young on January 7, and spoke to "someone," but was unable to reach Young; however, at her deposition Call stated she did not attempt to call Young that day. (Dkt. No. 38, Ex. D, Karen Call Aff. Part I at 18:23–19:8.)

On January 8, Plaintiff drove her daughter back to Greenfield. She neither reported to work that afternoon nor called Young, Shea, or any other supervisor to say she would not be going into work that day.[6]

Plaintiff reported to work at the clinic on January 9 at 9 a.m. According to Shea's deposition testimony and her handwritten notes from that date, Call told

5. The parties dispute whether Call promised to come in on January 8 to perform the necessary maintenance task or merely said she would "try" to make it in. *(Compare* Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 156:14–22 *with* Dkt. No. 48, Ex. 22 at 1.)

6. At her deposition, Call stated that she had called Bio–Medical's Keene office (apparently looking for Young) on January 8. (*See* Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 11:6–

17:18.) However, it is evident that this statement is incorrect, since Plaintiff said she had made the call from a payphone at the hospital but she was not at BMC that day. (*Id.*) Plaintiff may simply have been confused about the correct date at the time of her deposition; regardless, it is undisputed that Call did not actually speak to any of her supervisors on January 8. (*Id.* at 22:10–23:12.)

Shea that she was too tired to go into work the night before because she returned late from Boston and had taken a nap. (Dkt. No. 48, Ex. 22 at 1; Dkt. No. 38, Ex. J, Shea Dep. 45:13–23.) Call also presented Shea with an undated note from Dr. Aron Schuftan of Boston Medical Center, Jennifer's treating physician, reading: "Ms. Karen CALL was taking care of her daughter at Boston Medical center. Pls. excuse her from work from 1/2/04 till 1/9/04." (Dkt. No. 38, Ex. AA.) Shea notified Young that she had received this note. None of the Bio–Medical staff sought further documentation from Call, nor did anyone bring up the potential applicability of the FMLA.

Young decided that Call should be terminated (1) because she was absent from work on January 8 without calling him; (2) she had called only Shea, not Young as instructed, regarding her January 6 and 7 absences; and (3) she had long-standing attendance issues and performance problems. Young informed the human resources department of his intent, noting that Call had been on approved leave only through January 7. He also consulted with Dickey, the regional manager and his supervisor, who concurred with the decision to fire Call. Plaintiff was informed of her termination on January 12, 2004. The termination notice states as grounds for discharge that

> Karen has failed to follow expected procedure for reporting an absence from work. The reporting procedure was discussed with Karen when she was suspended . . . . that she was to report any absence to her immediate supervisor. The issue of correctly "calling-in" was emphasized at the time of her review (4/9/03). And reiterated (on 4/15/03) after she once again failed to follow protocol. On 1/7/04, Karen call [sic] the clinic manager (not her supervisor, Mike Young) to report her continued absence (1/5–7/03), explaining that she would be

in "sometime" on Thursday 1/8/03. Karen did *not* report to work on Thursday resulting in another *No call, No show.* (Dkt. No. 38, Ex. Z (emphasis in original).) Later, in their depositions, both Young and Dickey cited Call's entire attendance history and performance problems as having entered into their decision to fire her.

## C.   *Jennifer Call's Medical Condition*

The parties hotly dispute the facts available regarding Jennifer's medical condition through January 7. Karen Call reports that she observed her daughter to be extremely depressed and lethargic in the wake of the abortion procedure, suffering disabling abdominal pain, and incapable of caring for herself without her mother's prompting and assistance. Meanwhile, the medical records provide some evidence that when Jennifer was admitted to BMC, and certainly by the time she was discharged, her condition was not dire, the fever and abdominal pain that she had reported earlier had abated, and she could walk on her own. (*See generally* Dkt. No. 38, Ex. CC.) The history taken when Jennifer was admitted indicates that she could undertake activities such as walking, grooming, feeding, and bathing herself without assistance and had no "active psychiatric disorder." (*Id.* at 13.) However, these records are far from comprehensive and Karen Call even suggests that Jennifer may have misreported her condition upon discharge from both Franklin and BMC because of her desire to leave the hospital.

There is a much sparser record as to Jennifer Call's medical condition on January 8. The relevant evidence is confined to Karen Call's observation that during the drive back to Greenfield on that day, Jennifer "could not sit in the car seat unless it was reclined, and every time we went over any kind of bump in the road, she would wince because it was very painful for her

body to be jostled in any way." (Dkt. No. 48, Aff. of Karen Call ¶ 27.) Other than that, the only documentation or testimony relating to January 8 is the undated doctor's note submitted by Karen Call to her employer, stating that Plaintiff needed to be excused from work until January 9 because she "was taking care of her daughter at Boston Medical Center." (Dkt. No. 38, Ex. AA.)

Jennifer was scheduled for a follow-up appointment approximately two weeks after her return to Greenfield on January 8. Aside from this appointment she did not seek any medical treatment after her discharge from BMC.

### III. DISCUSSION

On cross-motions for summary judgment, the court's task is "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996). Summary judgment is appropriate if the factual record, with any disputes it contains construed in favor of the non-moving party, supports a holding that there is no triable issue with respect to any material fact and the moving party deserves judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

### A. Uncontested Issues

At oral argument, Plaintiff confirmed that she does not oppose Defendants' contention that Fresenius was never Call's employer and thus cannot be held liable for her discharge under either the FMLA or a breach of contract theory. Therefore, Fresenius will be dismissed from the suit.

Similarly, Call has elected not to pursue the claim that Bio–Medical breached a contract between the two parties embodied in its written employment policies. There-

fore, the breach of contract charge (Count II) will also be dismissed without any discussion of its merits.

### B. The Family and Medical Leave Act Claim

#### 1. Statutory Background.

The Family and Medical Leave Act is designed to accommodate the "times in a person's life when that person is incapable of performing her duties for medical reasons," *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998) (citation omitted), in order "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). At the same time, the statute recognizes the need to "accommodate[ ] the legitimate interests of employers." *Id.* § 2601(b)(3). Therefore, the FMLA allows "employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." *Id.* § 2601(b)(2).

The FMLA sets out two major steps in the process of obtaining leave. First, an employee must appropriately notify her employer as to her need for time off. 29 U.S.C. § 2612(e); 29 C.F.R. § 825.302–.304. Second, once notice is given, the statute's certification provision affords the employer an opportunity to ask for medical verification of any relevant health condition and to seek a second and third medical opinion in support of the leave request. 29 U.S.C. § 2613; 29 C.F.R. § 825.305–.308.

The FMLA protects the right to leave by prohibiting an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" the rights provided by the statute. *Id.* § 2615(a)(1). Plaintiff charges Bio–Medical with violating this provision by refusing to recognize her entitlement to FMLA leave for January 8. (Dkt. No. 2, Am.

Compl. ¶¶ 27–29.) Additionally, Call alleges that Defendants discriminated against her by firing her for taking FMLA leave, a theory not explicitly identified in the FMLA but recognized by the First Circuit in *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159–60 & n. 4 (1st Cir.1998). *See also* 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c).

### 2. *Interference.*

In order to succeed on her interference claim, Plaintiff must show:

> "First, . . . that she fit the definition of an "eligible employee." Second, . . . that she worked for an employer covered by the Act. . . . Third, . . . that she qualified for FMLA benefits for one of four statutory reasons. . . . Fourth, . . . that she gave her employer appropriate notice. . . . Finally, . . . that the employer denied her benefits to which the FMLA entitled her."

*Wheeler v. Pioneer Developmental Servs.*, 349 F.Supp.2d 158, 164 (D.Mass.2004) (citations omitted). In this case, only the three latter elements are disputed.

Call bears the burden of proof with respect to her entitlement to FMLA leave, and thus on summary judgment "she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir.1995).

### a. *Jennifer Call's Medical Status.*

With respect to taking leave to care for a child, the FMLA differentiates between minor children, under eighteen years of age, and adult children, eighteen years of age or older. 29 U.S.C. § 2611(12). A parent is entitled to leave to care for a minor son or daughter as long as the child is suffering from a "serious health condition." *Id.* § 2612(a)(1)(C). However, care for an adult child only fits within the scope of this entitlement if the child is also "incapable of self-care because of a mental or physical disability." *Id.* § 2611(12). This additional requirement manifests "Congress's clear intent to set a higher bar for a parent's leave entitlement to care for a child eighteen years of age or older." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 103 (1st Cir.2001).

■ Call's FMLA interference claim cannot survive if she does not show that she was actually entitled to FMLA leave on the dates she was absent because she needed to care for her daughter. *See Wheeler v. Pioneer Developmental Servs.*, 349 F.Supp.2d 158, 164 (D.Mass.2004) (describing final element of FMLA claim as requiring plaintiff to prove "that the employer denied her benefits *to which the FMLA entitled her*") (emphasis added); *cf. Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 384 (4th Cir.2001) ("[T]he district court correctly required Rhoads to prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have interfered."). The first step in surviving summary judgment therefore requires Plaintiff to point to evidence that, if believed by a jury, would demonstrate that her daughter was suffering a "serious health condition" and was also "incapable of self-care" due to a disability. The evidence provided by Call regarding her daughter's condition is meager, but it just barely allows her to survive summary judgment on this issue.

Before discussing Jennifer Call's medical condition, the court must address the threshold issue of whether BioMedical has lost its opportunity to litigate this question. Plaintiff argues that her employer may not challenge her daughter's medical status in litigation when it did not utilize the FMLA's medical certification procedures to do so at the time she sought leave. *See* 29 U.S.C. § 2613(a) ("An em-

ployer may require that a request for leave ... be supported by a certification issued by the health care provider of the eligible employee or of the son, daughter, spouse, or parent of the employee, as appropriate."). Citing this court's own decision in *Wheeler v. Pioneer Developmental Services*, 349 F.Supp.2d 158 (D.Mass.2004), Plaintiff argues that Defendant may not contest Jennifer Call's medical condition in court without having first followed the certification process. In *Wheeler*, this court ruled for a plaintiff who had been fired after failing to comply with her employer's documentation deadlines for her leave request, stating that "[a]n employer who chooses not to exercise [its rights regarding medical certification] waives them and is precluded from challenging the propriety of the employee's leave request at a later trial.... As [the defendant] did not ask [its employee] to obtain a second opinion, it cannot question [the employee's] incapacity now." *Id.* at 168–69 (citation omitted).

The court has since reconsidered the scope of this broad dicta. If applied verbatim, it would require every employer to invoke the full panoply of FMLA mechanisms or be prohibited ever after from challenging the legal adequacy of even the most paltry evidence regarding an employee's medical condition. This requirement would over-emphasize a statutory provision that merely states that "[a]n employer *may* require that a request for leave ... be supported by a certification." 29 U.S.C. § 2613(a) (emphasis added). The *Wheeler* holding does not reach that far, especially given that in *Wheeler* there was no dispute concerning the specific facts of the plaintiff's medical condition, merely regarding the legal effect of her symptoms under the FMLA. 349 F.Supp.2d at 167–68. Thus, while Bio–Medical must still satisfy its burden on summary judgment, its decision not to seek medical certification does not bar it from disputing Jennifer Call's incapacity during the relevant period.[7]

Since Call was absent to care for her adult daughter, whether she was entitled to FMLA leave "depends upon whether

---

**7.** This less stringent approach is in line with the developing case law on this issue. The single case relied on in *Wheeler, Sims v. Alameda–Contra Costa Transit Dist.*, 2 F.Supp.2d 1253 (N.D.Cal.1998), is a somewhat dubious basis for the broad rule articulated in the *Wheeler* dicta. The *Sims* holding that an employer forfeits the right to challenge an employee's medical condition upon failure to utilize the medical certification procedures was relatively narrow; the district court stated that the rule applied only where an employee's "initial certification was sufficient to establish that he had such a condition." *Sims*, 2 F.Supp.2d at 1263; *see also Marchisheck v. San Mateo County*, 199 F.3d 1068, 1077 (9th Cir.1999) (holding *Sims* inapplicable where a doctor's letter was inadequate because it "did not satisfy the requirements for medical certification specified by [29 U.S.C. § 2613(b)]" and "did not even establish or claim that [the plaintiff] had a serious medical condition"); *Dowell v. Ind.*

*Heart Physicians, Inc.*, No. 03–1410, 2004 WL 3059788, at *5, 2004 U.S. Dist. LEXIS 26433, at *16 (S.D.Ind. Dec. 22, 2004) (distinguishing *Sims* as a case where the original medical certification was facially sufficient to support a finding of a serious medical condition); *Peterson v. Exide Corp.*, 123 F.Supp.2d 1265, 1270–71 (D.Kan.2000) (similar). Moreover, a number of courts have either ignored *Sims* or expressly criticized it for circumventing the FMLA's facially permissive language with regard to the certification process, since the statute merely provides that an employer *"may"* seek medical certification of a leave request. 29 U.S.C. § 2613(a); *see, e.g., Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572 (6th Cir.2007); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373 (4th Cir.2001); *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858 (8th Cir.2000); *Porter v. N.Y. Univ. Sch. of Law*, No. 99–4693, 2003 WL 22004841, 2003 U.S. Dist. LEXIS 14674 (S.D.N.Y.2003), *aff'd* 392 F.3d 530 (2d Cir.2004) (per curiam).

her daughter (1) had a serious health condition, (2) was incapable of self-care, and (3) was so incapacitated because of a mental or physical disability." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 95 (1st Cir.2001). Bio–Medical does not contest for the purposes of summary judgment that Jennifer was suffering from a serious health condition (Dkt. No. 39, Mem. of Law in Support of Defs.' Mot. for Summ. J. 5 n. 2), and therefore the court looks only to the second and third prongs of this inquiry.

FMLA regulations define the term "incapable of self-care" to mean that

> the individual requires active assistance or supervision to provide daily self-care in three or more of the "activities of daily living" (ADLs) or "instrumental activities of daily living" (IADLs). Activities of daily living include adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing and eating. Instrumental activities of daily living include cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc.

29 C.F.R. § 825.113(c)(1) (*quoted by Navarro v. Pfizer Corp.*, 261 F.3d 90, 96 (1st Cir.2001)). The same regulation states that a "physical or mental disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 29 C.F.R. § 825.113(c)(2).

The capacity issue is the most difficult hurdle for Plaintiff, mainly because the record regarding her daughter's medical condition is minimal at best. Still, with regard to the days when Call was absent up through January 7, she has offered testimony through her deposition and affidavit that, if credited by a jury, could establish that Jennifer Call was not capable of caring for herself without her mother's assistance.

According to Plaintiff, from December 29 until January 7, she observed that her daughter was experiencing abdominal pain, required help with basic tasks such as walking to the bathroom, and appeared listless and depressed such that she would not perform basic activities like showering and eating without prompting by her mother.[8] (*See* Dkt. No. 48, Aff. of Karen

---

**8.** Defendants have moved to strike portions of Plaintiff's factual account taken from this affidavit. (Dkt. No. 53.) To the extent that motion is based on the argument that Call's testimony constitutes hearsay evidence concerning Jennifer's statements, the court notes that this ruling is based solely on Plaintiff's reported direct observations of her daughter's physical state and conduct, the credibility of which must be weighed by a jury. (The question of whether any of Jennifer's alleged statements may fit any hearsay exception need not be decided at this juncture.)

Defendants' objection that Call's assertions constitute impermissible lay opinion on matters requiring medical expertise is similarly unavailing. Other courts have accepted non-expert testimony regarding a person's ailment and physical capabilities in FMLA cases, even when unaccompanied by expert testimony. *See, e.g., Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572 (6th Cir.2007) (considering plain-

tiff's daughter's own testimony about her mental state); *Lubke v. City of Arlington*, 455 F.3d 489, 495–96 (5th Cir.2006) (similar). As the First Circuit noted in *Katz v. City Metal Co.*,

> There is certainly no general rule that medical testimony is always necessary to establish disability. Some long-term impairments would be obvious to a lay jury (e.g., a missing arm) and it is certainly within the realm of possibility that a plaintiff himself in a disabilities case might offer a description of treatments and symptoms over a substantial period that would put the jury in a position where it could determine that he did suffer from a disability ...

87 F.3d 26, 32 (1st Cir.1996). (Though *Katz* was a case under the Americans with Disabilities Act rather than the FMLA, the inquiry into the existence of a disability under either statute is substantially the same. *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 96 (1st Cir.2001).)

Call ¶¶ 8, 10, 11, 14–19, 21, 22, 25–27.) This description, if credited, would allow a reasonable jury to conclude that Jennifer Call could not bathe, dress, groom, or otherwise care for herself in basic ways for a period of almost two weeks, thus satisfying the regulatory definition of "incapable of self-care because of a mental or physical disability." *Cf. Navarro v. Pfizer Corp.*, 261 F.3d 90, 96–105 (1st Cir.2001); *see also Scamihorn v. Gen. Truck Drivers, Local 952*, 282 F.3d 1078 (9th Cir.2002) (finding triable issue as to whether plaintiff's father's depression rendered him incapable of self-care).[9]

Bio–Medical asserts that Plaintiff's version of events is fatally contradicted by Jennifer Call's medical records. It points to several specific facts: Jennifer was not admitted to Franklin Medical Center when she went there on December 29 (Dkt. No. 38, Ex. BB at 10); when Jennifer was admitted to BMC on January 6, medical records indicate that she could undertake activities such as walking, grooming, feeding, and bathing herself without assistance (Dkt. No. 38, Ex. CC at 12–16); Jennifer reported on the morning of January 7, after she had successfully passed the fetus, that she experienced no pain or nausea overnight and was able to walk to the bathroom (*id.* at 17–18); Jennifer was discharged from BMC around 10 a.m. on January 7 with no restrictions on her activities besides a twenty-four hour prohibition on driving, an order for six weeks of "pelvic rest," and the instruction not to do any heavy lifting (*id.* at 26); Jennifer's January 7 discharge note also indicated that she could perform a number of activities independently, including feeding, bathing, dressing, and grooming herself (*id.* at

23); and Jennifer sought no further medical care between her discharge from BMC and her scheduled follow-up appointment one to two weeks later. (Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 78:6–79:3.)

However, Karen Call's testimony as described above indicates that these medical records offer an incomplete, and possibly inaccurate, picture of Jennifer's condition. Plaintiff alleges that Jennifer told her that she was in "a tremendous amount of pain" on January 7, but reported to the BMC staff that she was fine "because she just wanted to leave" the hospital. (Dkt. No. 48, Aff. of Karen Call ¶ 25.) Regardless of that potentially hearsay evidence, certainly Call's detailed observations of her daughter over the course of several days are not irredeemably contradicted by the necessarily brief notations in Jennifer's medical record. Any conflict between Plaintiff's account of her daughter's condition and the limited observations available in the medical record is thus a factual issue to be resolved by the jury. The court cannot render summary judgment on the question of Jennifer Call's medical condition during the period for which Plaintiff sought FMLA leave.

Bio–Medical stresses that, whatever Jennifer's condition up through January 7, there is simply no evidence regarding her status on January 8 from which a jury could conclude that she was incapacitated on that key date. The allegations offered by Plaintiff with respect to the events of January 8 are indeed sparse. The only detailed evidence available regarding the 8th is Karen Call's observation that during the drive from Boston to Greenfield her daughter could not sit up in the car and

---

9. Although Jennifer Call's indisposition lasted for a shorter time than that of the plaintiff's child in *Navarro*, who was confined to bed for several weeks, *Navarro* conclusively held that the duration element of the disability determination does not have the same significance in applying the FMLA as it does under the ADA and "leaves room for an impairment of modest duration to be regarded, in some cases, as 'substantially limiting' for FMLA purposes." 261 F.3d at 103.

winced when she was jostled by the vehicle going over any bumps. Otherwise, there is little to illuminate the path of Jennifer's recovery from being substantially incapacitated on January 7 (according to Plaintiff) to apparently well enough to take care of herself when Karen Call went into work on January 9.[10]

However, the court must acknowledge the possibility that a jury could reasonably infer from Call's description of her daughter as suffering serious physical and psychological problems for almost two weeks, combined with her observation that Jennifer continued to endure at least physical pain during the car ride to Greenfield, that Jennifer Call's incapacitation lasted through January 8 and did not abate until the next day. Though undeniably meager, these facts are not quite the bald, unsupported assertion of incapacity or illness that has led other courts to dismiss FMLA claims. *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity."); *McCleary v. Nat'l Cold Storage, Inc.*, 67 F.Supp.2d 1288, 1300 (D.Kan.1999) ("[T]he burden rests with the plaintiff to offer more than conclusory and general statements about his leg injury."). *Compare Sakellarion v. Judge & Dolph, Ltd.*, 893 F.Supp. 800, 807 (N.D.Ill.1995) ("[The plaintiff] has not submitted any medical records or other evidence ... other than [the] assertion that she needed to stay in bed. A plaintiff's assertion that her adult daughter needed to stay in bed, without more, is not sufficient evidence from which a jury could infer that the daughter was incapable of self-care.").

Call's alleged comments to Nancy Shea that she had been too tired to come in on January 8 and had taken a nap when she and Jennifer returned from Boston, highlighted by Defendants, do not preclude a finding that Jennifer required her mother's care that day. Plaintiff's assertion that Jennifer was incapacitated on January 8 creates a material issue of disputed fact as to whether Call was entitled to leave. Furthermore, even if Call did take a nap at some point on January 8, she did not have to be caring for Jennifer the entire day in order to merit FMLA leave, since a jury could believe that Plaintiff was unprepared to go into work that evening after spending the entire day caring for her daughter. A District of Maine decision, in a similar case, recognized that a plaintiff might be "technically ... available to work" but unable to do so after spending a large portion of the day caring for a sick relative. *Brunelle v. Cytec Plastics, Inc.*, 225 F.Supp.2d 67, 77 & n. 13 (D.Me.2002) (refusing to dismiss case even though the plaintiff went out for drinks with his friends at the time he was supposed to be at work, since he had just undertaken a "daylong vigil at his critically ill father's bedside" from 7 a.m. and thus might not be prepared to com-

---

**10.** The undated doctor's note offered by Plaintiff (Dkt. No. 38, Ex. AA) is unhelpful, merely stating that Karen Call needed to be out on January 8 to take care of her daughter and offering little factual content regarding whether Jennifer was unable to care for herself. Moreover, although the note is undated, it appears from Plaintiff's testimony that it was written on January 7, when she and Jennifer left the hospital. (Dkt. No. 38, Ex. D, Karen Call Dep. Part I at 144:10–145:17.) Even if that is incorrect, it is unclear how the doctor, who had been Jennifer Call's treating physician while she was at BMC, could have had any firsthand knowledge of her condition on January 8 since Jennifer checked out of the hospital on January 7 and returned to Greenfield on January 8. *Cf. Novak v. Metro-Health Med. Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007) (finding doctor's FMLA certification unreliable where doctor lacked personal knowledge of plaintiff's condition at the time in question).

mence a twelve hour shift at 7 p.m. that evening). While the court would not go so far as to credit any period of rest in the wake of caring for an ill relative as an integral part of FMLA leave, the statute does not require a minute-by-minute accounting of a plaintiff's time.

### b. *Appropriate Notice.*

Next, the court must decide whether Karen Call gave Defendants proper notice of her need for FMLA leave. Department of Labor regulations provide that where the circumstances requiring leave are fore-seeable, an employee must give notice thirty days before taking time off, or as soon as practicable if thirty days' warning is not possible. 29 C.F.R. § 825.302(a). Where "the approximate timing of the need for leave is not foreseeable," the employee should merely notify the employer as soon as practicable. *Id.* § 825.303(a). In both foreseeable and unforeseeable leave situations, notice "as soon as practicable" is generally expected to be within one or two days of when the employee learns that FMLA leave is necessary. *Id.* §§ 825.302(a), 825.303(a).[11] An employee

11. The undisputed facts of this case do not conclusively establish whether Call's absence should be treated as foreseeable or unforeseeable, since the parties disagree as to whether Plaintiff specified the dates for her leave ahead of time. The creates some uncertainty as to the correct legal standard for appropriate notice. Most significantly, it is unclear whether Call could be fired for failing to comply with Bio–Medical's internal procedures for requesting leave, namely the command to contact Young rather than Shea (assuming a jury found that she did not get permission for her absence from Young). The FMLA regulations address this question with regard to *foreseeable* leave, providing:

> An employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice.

29 C.F.R. § 825.302(d); *see also* 29 C.F.R. § 825.304; *Zades v. Lowe's Home Ctrs., Inc.,* 446 F.Supp.2d 29, 47 (D.Mass.2006) ("The regulations clearly state, and Defendant has cited no case to the contrary, that Plaintiff cannot be denied her FMLA rights because she either failed to follow Defendant's internal procedures or specifically invoke the FMLA."). Thus, with respect to foreseeable leave Call could not be denied FMLA leave for failing to contact Young as long as she timely conveyed effective notice of her need for time off in some other manner.

On the other hand, the regulations do not address the role of internal employer procedures in relation to *unforeseeable* leave, a gap that has been filled by a tangle of opposing precedents. *Compare, e.g., Cavin v. Honda of Am. Mfg.,* 346 F.3d 713, 721 (6th Cir.2003) (holding that, with respect to unforeseeable leave as well as foreseeable leave, "employers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures ... as long as 'the employee gives timely verbal or other notice'"); *Mora v. Chem-tronics, Inc.,* 16 F.Supp.2d 1192, 1216–17 (S.D.Cal.1998) (applying the 29 C.F.R. § 825.302(d) prohibition on denying foreseeable leave because of a failure to comply with an employer's "usual and customary" procedures to an unforeseeable leave situation) *with Lewis v. Holsum of Fort Wayne, Inc.,* 278 F.3d 706, 710 (7th Cir.2002) (holding that employee's discharge did not violate the FMLA where she could have, but failed to, call in advance to report she would not be coming in for scheduled shifts after an asthma attack); *Holmes v. Boeing Co.,* No. 98–3056, 1999 WL 9760, at *2–*3, 1999 U.S.App. LEXIS 377, at *7 (10th Cir. Jan. 12, 1999) (unpublished table case) ("The FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent in a nonemergency situation.") (citing 29 C.F.R. § 825.303).

Generally, this court is inclined to agree with the following discussion of this thorny issue:

> [The FMLA regulations] do not clearly explain when leave is to be viewed as "fore-

is only required to provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave," and does not have to specifically mention the FMLA itself. *Id.* § 825.302(c).

■ There are several material fact issues that preclude resolution of this issue for either party as a matter of law. To begin with, the parties dispute whether Call actually asked for and was granted leave through January 8 when she first sought time off on December 29. Defendants claim that Plaintiff's contention in her deposition that she was granted leave through January 8 and never expected to return to work on that date is contradicted by the allegations in her complaint and her answers to interrogatories. (Dkt. No. 38, Defs.' Local Rule 56.1 Statement of Undisputed Material Facts ¶ 18.) A jury must determine whether Call's account is credible and, if so, whether her initial request operated as timely notice to Bio–Medical of her need for leave.[12]

There is also a genuine factual issue as to whether, regardless of the substance of Call's initial conversation with Kleeberg, Kleeberg's direction to keep her "posted" would be reasonably interpreted to require Call to continue to update Bio–Medical as to her status even with respect to specific dates for which she had already been granted leave. It is permissible under the

FMLA for an employer to "require an employee on FMLA leave to report periodically on the employee's status and intent to return to work," although "[t]he employer's policy regarding such reports may not be discriminatory and must take into account all of the relevant facts and circumstances related to the individual employee's leave situation." 29 C.F.R. § 825.309(a); *see also Ruocco v. Coca–Cola Enters.*, No. 02–4043, 2003 U.S. Dist. LEXIS 1674, at *4–*7 (S.D.N.Y. Feb. 6, 2003).

Accordingly, Kleeberg's statement could be reasonably understood as a mandate to contact Bio–Medical periodically even on those dates for which Plaintiff had tentatively obtained leave, much as Call did on January 6 and 7, and thus a jury could find that Plaintiff's termination was a legitimate response to her failure to check in on January 8. *Cf. Bacon v. Hennepin County Med. Ctr.*, No. 06–2359, 2007 WL 4373104, at *11, 2007 U.S. Dist. LEXIS 91103, at *35–*36 (D.Minn. Dec. 11, 2007) (stating that an employer may fire an employee for failing to check in as requested regarding his or her return-to-work date). Crediting Plaintiff's description of events, however, a jury might also reasonably believe that she thought her request for leave through January 8 was sufficient to notify Bio–Medical that she would be absent on that date and that a later confirmation was not required. *Cf. Brunelle v.*

seeable" or "unforeseeable." ... In fact, the regulations blur the distinction between the two because both [29 C.F.R. §§ 825.302 and 825.303], at bottom, require that an employee give notice as soon as practicable under the individual circumstances of the case. Regrettably, §§ 825.302 and 825.303 actually do more to confuse than to clarify the FMLA's requirements....

*Spraggins v. Knauf Fiber Glass GmbH, Inc.*, 401 F.Supp.2d 1235, 1239–40 (M.D.Ala.2005) (citations omitted). As to requirements regarding *who* an employee must contact, therefore, it seems best to adapt the *Spraggins*

court's approach of applying a uniform standard with respect to both types of leave. Therefore, where an employee has provided timely and effective notice within the meaning of section 825.302(d), an employer may not use technical noncompliance with its internal procedures to deny FMLA leave.

12. As one court of appeals has noted, "[b]ecause adequacy of notice is a fact-rich question, it is perhaps best resolved by the trier of fact." *Burnett v. LFW Inc.*, 472 F.3d 471, 479 n. 4 (7th Cir.2006).

*Cytec Plastics, Inc.*, 225 F.Supp.2d 67, 77–78 (D.Me.2002) (denying summary judgment on issue of adequate notice where, though plaintiff failed to check in on the day of his absence, he had previously told his supervisor of his father's medical difficulties and his supervisor had allegedly responded, "If you are not in, I will know why").

Finally, there is a material factual dispute as to whether Call told Shea she would "try" to be in on January 8 or in fact promised to go in on that date, and what the effect of either statement would be. The FMLA would not bar Bio–Medical from discharging Call for her January 8 absence if she had promised to appear on that date yet failed to do so. *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir.2006).

These myriad factual disputes, central to the issue of whether Call gave appropriate notice of her need for FMLA leave, prevent resolution of the FMLA interference claim as a matter of law for either party. It is the jury's province to resolve these disagreements and come to a conclusion as to whether Plaintiff provided proper notice under the circumstances.

### 3. *Discrimination Claim.*

■ Plaintiff also offers a discrimination/retaliation[13] charge against Defendants, alleging that her termination was illegally motivated by her taking of (ostensibly) FMLA leave. To make out a *prima facie* case of discrimination under the FMLA, a plaintiff must show "that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir.1998). In a discrimination case, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id.* at 160.

Plaintiff has established that the first prong of this analysis, whether she was entitled to FMLA leave, rests on disputed facts. However, she has not satisfied her burden of impugning Defendants' proffered nondiscriminatory reason for her discharge. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998) (laying out the legal framework for analyzing an FMLA discrimination claim).

■ Bio–Medical consistently and reasonably warned Plaintiff, well before she took this leave, that she could be fired for a no-call/no-show. Plaintiff had documented attendance problems and had even been previously suspended for a no-call/no-show. Finally, Defendant has been consistent in its explanation that it fired Plaintiff for failing to call on January 8 when it expected her to return to work, not because she had taken FMLA leave beforehand.[14] This was a legitimate, nondiscriminatory reason for Call's discharge.[15] *Cf.*

---

**13.** Plaintiff terms this element of her charge a "discrimination" claim, but the First Circuit has also discussed similar fact patterns as "retaliation" claims. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir.2005).

**14.** Plaintiff herself noted that neither Young nor Shea seems to have even considered the applicability of the FMLA to Call's absences from January 4 through January 8. (Dkt. No. 46, Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute ¶¶ 43–45.) This undermines any allegation that they discharged Plaintiff specifically because of her utilization of FMLA rights.

**15.** While Defendants might have been mistaken in their understanding of Call's plans, she has not produced any evidence suggesting they did not sincerely believe she would be coming into work on January 8.

*King v. Preferred Tech. Group,* 166 F.3d 887, 893 (7th Cir.1999) (recognizing a legitimate reason for discharge where an employer fired an employee who returned one day late from FMLA leave pursuant to established policy allowing termination for such behavior).

Furthermore, there is no evidence of record casting doubt on this explanation. Plaintiff's strongest argument is the temporal proximity between her utilization of FMLA leave and her termination on January 8. However, Call had taken FMLA leave on a number of occasions since as early as August 2002, without negative consequences. *Cf. Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 337–38 (1st Cir.2005) ("While 'protected conduct closely followed by adverse action may justify an inference of retaliatory motive,' . . . Colburn began to take leave in October 2001 and was not terminated until almost four months later, after he had taken more than twenty-five days of leave.") (citation omitted).

With respect to this specific leave, Kleeberg initially approved Plaintiff's absence without any objection and Shea continued to allow her leave as long as she was phoning in and keeping Defendant updated. Contemporaneous evidence in the form of Nancy Shea's notes and the termination notice affirms Defendant's explanation that Shea and Young expected Call to return to work on January 8, even if Plaintiff thought otherwise. Regardless of any previous friction between Call and Young,[16] Young's decision on this occasion to discharge Call was approved by the area supervisor, Kathryn Dickey, as well as the human resources department. Finally, at no point has Bio–Medical wavered in insisting that Plaintiff was fired for failing to call in on January 8, a date on which Young and Shea believed she was supposed to be at work, not for taking legitimate FMLA leave on prior dates. Plaintiff can point to nothing in the record that undermines this account. Since there is no genuine issue for trial with respect to the discrimination claim, Defendants are entitled to summary judgment on this aspect of Count I.

### C. *Plaintiff's Motion to Strike and for Sanctions*

As Defendants' Motion to Strike (Dkt. No. 53) plays no material role in the court's decision, *supra* n. 8, Plaintiff's Motion to Strike in response is moot.

### IV. CONCLUSION

For the foregoing reasons, the court hereby DENIES Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 44) and ALLOWS in part Defendant's Motion for Summary Judgment as to the FMLA retaliation claim (Dkt. No. 37). The interference segment of Count I remains for trial.

Additionally, Defendant Fresenius Medical Care Holdings, Inc., is dismissed from the case, as is Count II of Plaintiff's complaint regarding breach of contract. Finally, Defendants' and Plaintiff's Motions to Strike (Dkt. Nos. 53 & 58) are DENIED. The clerk is ordered to set the case down for a status conference to discuss further proceedings.

It is So Ordered.

---

**16.** Plaintiff points to Young's initial intention to issue Call a written reprimand after her FMLA leave request of April 2003 as evidence of his hostility to FMLA-related absences. However, Young's motive in that instance was the fact that Call violated Bio–Medical's policies by contacting Kleeberg instead of him, not the mere fact that she sought to utilize her FMLA rights.